UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TIMOTHY KACHINSKI

          Plaintiff,

v.

CITY OF TAYLOR, a Michigan municipal corporation,

          Defendant.

Former Circuit Court Case No. 26-000117-CZ
District Court No.
HON: _____

---

| | |
|---|---|
| Timothy Kachinski | Mark M. Sesi (P63105) |
| Plaintiff Pro Se | Gina U. Puzzuoli (P37992) |
| 8246 Robert St. | KITCH ATTORNEYS & |
| Taylor, MI 48180 | COUNSELORS, PC |
| (734) 775-1810 | Attorneys for Defendant City of Taylor |
| tkachins@gmail.com | 10 S. Main Street, Suite 200 |
| | Mt. Clemens, MI 48043 |
| | (586) 493-4407 |
| | gina.puzzuoli@kitch.com |

---

## NOTICE OF REMOVAL

TO:   The Honorable Judge of the United States
District Court for the Eastern District
of Michigan, Southern Division

Defendant, CITY OF TAYLOR, by its attorneys, KITCH ATTORNEYS &

COUNSELORS P.C., respectfully show this Court:

1.    A copy of the attached Summons and Complaint was delivered to the

City of Taylor via certified mail on January 9, 2026, and this Notice is being filed

with this Court within (30) days of the delivery of the Summons and Complaint in the above-entitled action.

2.     Plaintiff's Complaint, filed in the Wayne County Circuit Court and assigned to the Honorable Qiana Denise Lillard, Civil Action Number 26-000117-CZ, seeks relief under the United States Constitution for an alleged violation of rights and the application of federal immunity to officers.

3.     Specifically, Plaintiff alleges that he is entitled to relief under the United States Constitution relating to the execution of a federal task force agreement by the City of Taylor Police Chief with U. S. Immigration and Customs Enforcement.

4.     Plaintiff cites and relies upon multiple federal cases within his complaint alleging that they support the relief he requests.

5.     Plaintiff's claims that he is entitled to relief under the U. S. Constitution and laws of the United States, which are within the original jurisdiction of this United States District Court.

6.     Pursuant to 28 USC § 1331 and 28 USC § 1441, Defendant has the right to remove this case to federal court, and removal of this action from the Circuit Court for the County of Wayne to the United States District Court for the Eastern District of Michigan is proper.

7.      This Court has supplemental jurisdiction over the state law allegations in this case pursuant to 28 USC § 1367(a).

8.      Plaintiff's state law claims arise from the same common nucleus of operative facts as the federal law claims and is so intertwined with and related to Plaintiff's federal claims that they form part of the same case or controversy as those federal claims, over which this Court has original jurisdiction.

9.      Venue is properly laid in this Court pursuant to 28 USC § 1301 because Wayne County, Michigan is contained within the Eastern District of Michigan, Southern Division.

10.     Promptly after the filing of this Notice of Removal, this Defendant shall provide written notice to Plaintiff and the Clerk of the Wayne County Circuit Court as required by 28 USC §1446(d).

11.     All the requirements for this action to be removed to this Court by Defendant pursuant to 28 USC § 1441(a) and (b) have been satisfied.

WHERFORE, Defendant files this Notice of Removal, removing this action to the United States District Court for the Eastern District of Michigan.  Plaintiff is notified to proceed no further in state court unless or until the case is remanded by Order of the United States District Court.

KITCH ATTORNEYS & COUNSELORS, P.C.

s/ Gina U. Puzzuoli
GINA U. PUZZUOLI (P37992)
Attorneys for Defendant
10 South Main, Ste. 200
Mt. Clemens, MI  48043-7903
(586)493-4407
gina.puzzuoli@kitch.com

DATED: January 30, 2026

## CERTIFICATE OF SERVICE

Louchrisa Schwan, being duly sworn, deposes and says that on the the 30TH day of January, 2026, a copy of this *Notice of Removal* will be served on alll counsel of record, with the *Notice of Filing Notice of Removal*, which will be filed with the Wayne County Circuit Court, via their electronic efiling MIFile system.

s/ Louchrisa Schwan

Original- Court
1st Copy- Defendant
2nd Copy- Plaintiff
3rd Copy -Return

| STATE OF MICHIGAN THIRD JUDICIAL CIRCUIT WAYNE COUNTY | **SUMMONS** | **CASE NO. 26-000117-CZ** Hon.Qiana Denise Lillard |
|---|---|---|

Court telephone no.: 313-224-2240

| Plaintiff's name(s), address(es), and **telephone no(s)** Kachinski, Timothy | v | Defendant's name(s), address(es), and telephone no(s). CITY OF TAYLOR, a Michigan municipal corporation |
|---|---|---|
| Plaintiff's attorney, bar no., address, and telephone no Timothy Kachinski 8246 Robert St. Taylor, MI 48180 | | |

**Instructions:** Check the items below that apply to you and provide any required information. Submit this form to the court clerk along with your complaint and, if necessary, a case inventory addendum (form MC 21). The summons section will be completed by the court clerk.

**Domestic Relations Case**

☐ There are no pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

☐ There is one or more pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint. I have separately filed a completed confidential case inventory (form MC 21) listing those cases.

☐ It is unknown if there are pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

**Civil Case**

☐ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035

☐ MDHHS and a contracted health plan may have a right to recover expenses in this case. I certify that notice and a copy of the complaint will be provided to MDHHS and (if applicable) the contracted health plan in accordance with MCL 400.106(4).

☐ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.

☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in ☐ this court, ☐ _____ Court, where it was given case number _____ and assigned to Judge _____.
The action ☐ remains ☐ is no longer pending.

Summons section completed by court clerk. | **SUMMONS** |

**NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons and a copy of the complaint to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.
4. If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

| Issue date 1/5/2026 | Expiration date* 4/6/2026 | Court clerk Carla Keefe |
|---|---|---|

Cathy M. Garrett- Wayne County Clerk.

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

MC 01 (3/23)          SUMMONS          MCR 1.109(D), MCR 2.102(B), MCR 2.103, MCR 2.104, MCR 2.105

2026 JAN -9 P 3: 58

CITY CLERKS OFFICE

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

TIMOTHY KACHINSKI,

   Plaintiff,

v.

CITY OF TAYLOR, a Michigan municipal corporation,

   Defendant.

Case No. _____

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### (General Civil Action – Case Type CZ)

### PRELIMINARY STATEMENT

     This action challenges the *ultra vires* execution of a federal task-force agreement by the City of Taylor without lawful authorization under Michigan law. The agreement purports to obligate spending of tax dollars, alter the legal status, immunity, and accountability of municipal police officers through federal designation, notwithstanding the absence of required approval by the City's governing body. The agreement also conflicts with state law and disrupts structural constitutional frameworks and rights. Plaintiff seeks declaratory and injunctive relief to restore the charter, statutory, and constitutional limits governing municipal authority.

## INTRODUCTION

Municipalities in Michigan possess only those powers granted by the State and must exercise them in the manner prescribed by law. This case concerns whether the City of Taylor exceeded those limits when its Police Chief executed a federal task-force agreement without City Council authorization. That agreement remains operative and purports to reallocate sovereign authority and immunity in a manner not permitted under Michigan law, as well as commits the city to unauthorized expenditures – diluting lawful City police services to finance unauthorized non-municipal activities. Plaintiff does not seek relief related to enforcement actions or pre-enforcement, but instead seeks a judicial declaration clarifying the scope of municipal authority, validity of the agreement, and an end to unauthorized expenditures, prior to or independent of any enforcement action.

Plaintiff brings this action in his capacity as a municipal taxpayer under longstanding Michigan law authorizing taxpayers to prevent the unlawful expenditure of public funds, the incurrence of unauthorized public obligations, and assumption of public liability pursuant to an agreement executed without lawful authority. The injury alleged herein arose upon the execution of the agreement itself, which immediately committed municipal funds, altered the legal status of municipal officers, and purported to displace state-law accountability mechanisms, regardless of whether the agreement has yet been enforced. Plaintiff does not assert a generalized policy objection, but a concrete and particularized injury arising from unlawful municipal action affecting public funds, and the legal accountability framework governing municipal officers.

Plaintiff's standing does not depend solely on his status as a taxpayer, but also independently arises from his immediate and ongoing subjection to a materially different

legal regime governing police conduct, immunity, and judicial forums – independent of any future enforcement action – imposed without lawful authorization creating a present injury as a resident of the city. Plaintiff has been and continues to be injured by a loss of lawful state governance guaranteed by Michigan statutes by enactment itself.

## JURISDICTION AND VENUE

1. This is a General Civil Action – Case Type CZ seeking declaratory and injunctive relief arising under Michigan law and the United States Constitution. Jurisdiction is proper in this Court pursuant to MCL 600.605 and MCR 2.201.

2. Declaratory relief is proper under MCR 2.605 because an actual controversy exists regarding the validity and legal effect of the challenged agreement.

3. Venue is proper in Wayne County because Defendant is located in this County and the acts complained of occurred here.

4. This action is an original general civil action and is not an appeal from any administrative, judicial, or appellate decision. Although Plaintiff previously litigated related to federal claims arising from the same underlying municipal conduct; however, that federal action was dismissed without prejudice and without any adjudication on the merits. Accordingly, this action is not barred by claim preclusion or issue preclusion and seeks independent declaratory and injunctive relief arising under Michigan law.

## PARTIES

5. Plaintiff Timothy Kachinski is a resident of the City of Taylor, Michigan, and is subject to the City's municipal authority.

6.  Defendant City of Taylor is a Michigan municipal corporation located in Wayne County.

## FACTUAL BACKGROUND

7.  The City of Taylor is a home-rule municipality governed by the Michigan/US Constitution, Home Rule City Act, Urban Cooperation Act, Governmental Tort Liability Act, Uniform Budgeting and Accounting Act, and its City Charter.

8.  Michigan law requires that intergovernmental agreements affecting municipal authority or officer status receive authorization from the municipality's governing body.

9.  Executed April 2025, the City's Police Chief John Blair signed a Memorandum of Agreement with U.S. Immigration and Customs Enforcement pursuant to 8 U.S.C. § 1357(g).

10. No vote of the City Council was taken authorizing the agreement, and no ordinance or resolution approving it was adopted. The agreement was signed without the knowledge or permission of the Council or Mayor.

11. The agreement purports to designate participating Taylor police officers as federal employees for purposes of liability and immunity.

12. The agreement places ongoing and open-ended commitments and financial incurrences onto the City without lawful authorization.

13. The agreement remains operative and has not been rescinded.

## COUNT I – *ULTRA VIRES* MUNICIPAL ACTION

14. Plaintiff incorporates all preceding paragraphs.

15. This Complaint alleges that the Memorandum of Agreement ("MOA" – *Exhibit E*) between the Taylor Police Department and U.S. Immigration and Customs Enforcement was executed by Police Chief John Blair unilaterally without knowledge (*Exhibit B*) or authorization from the Taylor City Council (*Exhibit A*) and in violation of the Taylor City Charter (see § 7.1, 15.2-15.4), the Michigan Home Rule City Act (MCL § 117.3), and Michigan's Urban Cooperation Act of 1967 (MCL 124.501 et seq.; including but not limited to MCL 124.504 MCL 124.505(1), 124.505a(3)) – all of which require such a vote for authorization. The only vote on the agreement to date from an elected Taylor body has been from the Taylor Board of Education, which passed a resolution opposing it (*Exhibit C*).

16. This bypassed longstanding Michigan legal requirements for these task-force agreements, as seen in Michigan Department of Treasury numbered letter "1999-5 Drug Forfeiture Funds" (August 6, 1999 – *Exhibit F*) on federal-local law enforcement task-force agreements:

17. *"11. I am a member of a county (or township) board or a city (or village) council and the board (or council) has not entered into an agreement with other police agencies for drug enforcement purposes. May a police chief or sheriff enter such an agreement without the board's (or council's) approval?*

18. *No. The Urban Cooperation Act requires the agreement to be approved by the governing bodies of the participating units."*

19. That Department of Treasury opinion itself heavily cites Michigan Attorney General Opinion No. 6561 (1989 – *Exhibit G*), which itself states:

20. *"A law enforcement task force may be created by the legislative bodies of governmental units and, alternatively, law enforcement agencies may function as a joint enterprise.*

21. *A law enforcement task force...may be formed pursuant to various statutes, including the intergovernmental contracts between municipalities act and the Urban Cooperation Act of 1967."*

22. The opinion continues:

23. *"a municipality must appropriate any moneys or goods of a municipality under statutory authority or under contract which is statutorily authorized in order to permit subsequent expenditure. The Uniform Budgeting and Accounting Act, MCL 141.439(1); MSA 5.3228(39), imposes this requirement on units of local government:*

24. *'A member of the legislative body, the chief administrative officer, fiscal officer, an administrative officer, or an employee of a local unit shall not authorize or participate in the expenditure of funds except as authorized by a general appropriations act. An expenditure shall not be incurred except in pursuance of the authority and appropriations of the legislative body of the local unit.'"*

25. *"no expenditure of funds should be made by a task force without appropriation therefor[e] by the local units from which the participants of the task force originate."*

26. Together these official opinions provide clear evidence of multi-decade interpretations of state law consistent with the letter of the law cited here so far and further on in this Complaint. Furthermore, Mr. Blair in signing also violated

the MOA itself which states: "*By signing this MOA, each party represents it is fully authorized to enter into this MOA, accepts the terms, responsibilities, obligations, and limitations of this MOA, and agrees to be bound thereto to the fullest extent allowed by law*" (*Exhibit E – section XVIII*).

27. Since Mr. Blair lacked such authorization, the MOA lacks valid approval. Michigan courts have long held that where state law assigns approval authority to the legislative body, that assignment excludes substitution by executive action, even where executive authority might otherwise exist locally or by implication – see *Detroit City Council v. Mayor of Detroit*, 283 Mich. App 422; 770 NW2d 117 (2009), holding that executive action may not substitute for legislatively required approval in matters committing the municipality to binding legal obligations, and that state legislation overrides local practices or charter structure for approval authority. Not only lack of authorization, but lack of even prior notification was confirmed at the May 6th, 2025 City Council Meeting by this exchange between the Council, Mayor (not required for approval), and the Chief (*Exhibit B*):

28. "*Councilman JOHNSON: "I appreciate what you just said. My only concern is with the state of the country right now and what's going on, and you know what I'm talking about, I didn't know about it. I've been around 20 years and you know, working for the city and volunteering and I never heard that before. So I just think it would have been nice if the council had a heads up. Because we're getting bombarded."*

29. *Police Chief JOHN BLAIR: "Right. I accept full responsibility for that."*

30. *Mayor TIM WOOLLEY: Just to kind of jump in here and kind of touch on what Councilman Johnson said, I kind of agree. I was first notified on Friday evening, and well somebody texted me, the first thing I said was this is the first I'm hear[ing] of this, because I never heard of it or knew of it either. And I called John, you know, and he told me he was out of town, so I felt bad about that, but he said 'no, I'm good', so he went into the explanation and everything, and I said 'John, well a little heads up would have been nice.'"*

31. The City Council did not ratify the agreement thereafter (*Exhibit A*), and because the Open Meetings Act MCL 15.621 et seq. requires that all decisions of a governing body be made in public to be valid, this MOA lacks validity and certainly fails to meet the "voluntary" aspect laid out by Congress on the federal end. Plaintiff does not allege an independent violation of the Open Meetings Act; rather, the Act confirms that no lawful legislative authorization or ratification occurred, as none was taken by public vote of the City Council as required elsewhere by the Urban Cooperation Act, the MOA itself, the Uniform Budgeting and Accounting Act, the charter, and longstanding and well-established principles of legislative approval of binding agreements, incurrences, and expenditures.

32. Beyond that, the Chief's own voluntary commitment to this MOA is questionable (*Exhibit D*). Beyond *ultra vires* adoption of the agreement, the terms of that MOA commit City controlled taxpayer funds to these unauthorized functions as seen in *Exhibit E, Section X – Costs and Expenditures*:

33. *"Participating LEA personnel will carry out designated functions at the LEA's expense, including salaries and benefits, local transportation, and official issue*

*material. Whether or not the LEA receives financial reimbursement for such costs through a federal grant or other funding mechanism is not material to this MOA."*

34. *"The LEA is responsible for personnel expenses, including, but not limited to, salaries and benefits, local transportation, and official issue material used in the execution of the LEA's mission...The LEA is responsible for the salaries and benefits, including any overtime, of all its personnel being trained or performing duties under this MOA and of those personnel performing the regular functions of the participating LEA personnel while they are receiving training."*

35. *"The LEA is responsible for providing all administrative supplies (e.g. paper, printer toner) necessary for normal office operations. The LEA is also responsible for providing the necessary security equipment, such as handcuffs, leg restraints, etc."*

36. As a taxpaying resident of Taylor, Plaintiff has a direct interest in ensuring law enforcement funds are expended only for legally authorized public purposes. Here, law enforcement funds are being diverted into unauthorized *ultra vires* activities entered into outside of the law. Michigan law consistently requires legislative authorization for such expenditures and the incurrence of financial obligations; a principle reflected in the Urban Cooperation Act and the Uniform Budgeting and Accounting Act including but not limited to MCL § 141.437; 141.438; 141.439; 141.440; and with MCL 141.439(1) specifically stating:

37. *"A member of the legislative body, the chief administrative officer, an administrative officer, or an employee of a local unit shall not authorize or participate in the expenditure of funds except as authorized by a general*

*appropriations act. An expenditure shall not be incurred except in pursuance of the authority and appropriations of the legislative body of the local unit.*"

38. The Uniform Budgeting and Accounting Act prohibits the incurrence of expenditures and contractual obligations themselves, not merely the later disbursement of funds. As the MOA explicitly incurs such financial obligations (*Exhibit E*) and was signed by the "chief administrative officer" without legislative approval or appropriation (*Exhibit A*), it is in violation of the Act. It is not the subject matter (immigration) that triggers legislative approval – it is the incurrence of obligations and reclassification of officers, and as approval is a prerequisite to federal involvement, federal authorization does not cure the defect.

39. The issue compounds further beyond unlawful adoption and the ongoing commitment of taxpayer funds. The matter also extends into fundamentally altering Plaintiff's legal relationship with the police and which judicial forums he must seek redress in as the MOA is active and federally presumed as locally authorized (*Exhibit H* shows the MOA is federally active; judicial forum and legal relationship issues addressed in Count III).

40. In *City of Taylor v. Detroit Edison Co.*, 475 Mich. 109, 117-18 (2006), the Michigan Supreme Court held that a municipality's exercise of local authority "*cannot impinge on matters of statewide concern nor can a municipality regulate in a manner inconsistent with state law.*"

41. The State of Michigan regulates liability, immunity, and intergovernmental cooperation through Michigan's Governmental Tort Liability Act ("GTLA" – MCL §§ 691.1401-1419) and the Urban Cooperation Act (MCL § 124.509), and

these acts preclude municipalities from supplanting state tort remedies with the Federal Tort Claims Act ("FTCA"), Westfall Act, and *Bivens* – eliminating causes of action, or federalizing officers in a manner which facilitates such shifting of what color of law they act under (state or federal) for these purposes, absent express authorization.

42. Michigan law provides no authorization or authority for municipalities to convert their officers into federal actors for purposes of liability or immunity. To the contrary, the Urban Cooperation Act, which defines how municipalities may enter into such agreements, explicitly defines liability and immunity within interlocal agreements, the language of which directly conflicts with the MOA:

43. *MCL § 124.509 – Privileges, immunities, and benefits of officers, agency, agents, or employees; obligation or responsibility of public agencies.*

44. *(1) All of the privileges and immunities from liability, and exemptions from laws, ordinances, and rules, and all pensions, relief, disability, worker's compensation, and other benefits that apply to the activity of officers, agency, or employees of any public agents or employees of any public agency when performing their respective functions within the territorial limits for their respective agencies shall apply to the same degree and extent to the performance of those functions and duties of those officers, agents, or employees extraterritorially under the provisions of any such interlocal agreement.*

45. The 287(g) agreement's substitution of the FTCA and Westfall Act for the GTLA is therefore outside the scope of what Michigan law permits municipalities to

agree to in such agreements. *Exhibit E, section XIV* of the 287(g) MOA signed by Police Chief Blair explicitly replaces Michigan tort law with federal tort law:

46. *"Participating LEA [law enforcement agency] personnel will be treated as Federal employees for purposes of the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1), 2671-2680, and worker's compensation claims, 5 U.S.C. § 8101 et seq., when performing a function on behalf of ICE as authorized by this MOA. See 8 U.S.C. § 1357(g)(7); 28 U.S.C. § 2671. In addition, it is the understanding of the parties to this MOA that participating LEA personnel performing a function on behalf of ICE authorized by this MOA will be considered acting under color of federal authority for purposes of determining liability and immunity from suit under federal or state law. See 8 U.S.C. § 1357(g)(8)."*

47. The MOA itself in *Section XI (Exhibit E)* sets the standard for why the MOA is structurally *ultra vires* when applied in Michigan:

48. *"no participating LEA personnel will be expected or required to violate or otherwise fail to maintain the LEA's rules, standards, or policies, or be required to fail to abide by restrictions or limitations as may otherwise be imposed by law unless doing so would violate federal law."*

49. As this section requires adherence to Michigan law while the previously identified section cannot coexist with MCL § 124.509 and the GTLA, this MOA is structurally *ultra vires* as it innately sets terms that conflict with Michigan law while also requiring adherence to Michigan law with no severability. The MOA is therefore self-defeating in the context of its own terms and current Michigan law.

50. Under *City of Taylor* (2006), what the City of Taylor has done is *ultra vires* in not just adoption and implementation, but also in structure and operation as well; is *void ab initio*, and incapable of producing legal effects. Furthermore, under long-settled Michigan common law, municipal acts undertaken without lawful authorization and with terms that contradict state law are invalid, *ultra vires*, *void ab initio*, and cannot be cured by subsequent acquiescence, performance, or federal approval – even when contradictions and displacements of law are limited.

51. Previous Michigan precedents dealing with municipal contracts shifting liability in a manner inconsistent with Michigan law have been found to be invalid:

52. *"Contracts which violate a statute are contrary to public policy and cannot be enforced by the courts, even though actual injury does not result from the agreement." – Peeples v. Detroit*, 99 Mich App 285, 302, 297 NW2d 839 (1980).

53. No interpretation of municipal authority – however expansive – permits a city to contradict or nullify state law. Under the Michigan Constitution under Article VII, local power exists only subject to the constitution and law, and it therefore ends where state law governs. Silence by the Legislature is not permissive, and where it speaks it controls.

54. As the United States Supreme Court found in a federal context as well in *Trenton v. New Jersey*, 262 U.S. 182 (1923), *"In the absence of state constitutional provisions safeguarding it to them, municipalities have no inherent right of self-government which is beyond the legislative control of the state, but merely are departments of the state, with powers and privileges such as the state has seen fit to grant, held and exercised subject to its sovereign will. P. 262 U.S. 187."*

## COUNT II – DECLARATORY JUDGMENT (MCR 2.605)

55. Plaintiff incorporates all preceding paragraphs.

56. Declaratory relief is appropriate where a plaintiff seeks judicial clarification of the legality of governmental action and the controversy is real and ongoing.

57. Michigan courts apply a prudential standing doctrine, and satisfaction of MCR 2.605 is sufficient to establish standing to seek declaratory relief. See *Lansing Schools Education Association v. Lansing Board of Education*, 487 Mich 349; 792 N.W.2d 686 (2010): *"whenever a litigant meets the requirements of MCR 2.605, it is sufficient to establish standing to seek a declaratory judgment."*

58. As set forth above, Defendant City of Taylor has executed and implemented a MOA that purports to bind the City to participation in a federal task-force and to ongoing financial and operational obligations, without legislative authorization, appropriation by the City Council, and in conflict with Michigan law.

59. Plaintiff seeks a declaration regarding the legality and validity of that agreement under Michigan law, including whether the agreement is *ultra vires* and *void ab initio.*

60. The existence and operation of the agreement create a present and concrete legal controversy concerning the scope of Defendant's authority, the lawful use of municipal funds, and the legal status of City officers acting pursuant to the agreement.

61. Declaratory relief is appropriate notwithstanding the absence of enforcement actions or completed expenditures, because Plaintiff challenges the legality of the agreement itself and the City's authority to enter into it.

62. A declaratory judgment will terminate the uncertainty and controversy giving rise to this action by determining whether Defendant lawfully executed and may continue to operate under the agreement.

63. Accordingly, Plaintiff is entitled to a declaratory judgment pursuant to MCR 2.605 declaring the rights and legal relations of the parties.

64. Plaintiff seeks a declaration that the agreement is unauthorized, void, and incapable of altering municipal officer immunity or sovereign status.

## COUNT III – CONSTITUTIONAL IMPLICATIONS

65. Plaintiff incorporates all preceding paragraphs.

66. The constitutional implications underscore why strict compliance with Michigan authorization requirements is not merely procedural, but structurally necessary.

67. In addition to the state-law defects described above, the challenged MOA implicates federal constitutional structure. State courts of general jurisdiction are both empowered and obligated to adjudicate questions arising under the United States Constitution when those questions are properly presented in the course of resolving state-law disputes. See e.g., *Haywood v. Drown*, 556 U.S. 729 (2009).

68. Here, Plaintiff does not seek to displace state law with federal doctrine, but rather to address the federal constitutional consequences that necessarily flow from an *ultra vires* exercise of municipal authority – specifically, the attempted reallocation of sovereign responsibility, immunity, and accountability through an agreement executed without lawful state authorization.

69. This complaint is limited to the City of Taylor, but because it involves the *ultra vires* execution of a federal program, there are implications that present a need for

clarification on constitutional doctrine. This is so because of the unusual circumstances that arise from *ultra vires* adoption and structure at the state level, which result in an exclusive forum for addressing what would be foreclosed.

70. Because Federal Rules of Civil Procedure rely on state law and state court interpretations of that law, this Court's functional jurisdiction over Taylor officers is effectively displaced by the terms of the MOA with how lower federal courts currently interpret state sovereignty and color of law doctrine, absent clarification.

71. Supreme Court precedents on dual-sovereignty and color of law, if affirmed by this Court, resolve the issue cleanly. However, if the Sixth Circuit precedent on task-force source authority is regarded as persuasive, then it has implications for an *ultra vires* ruling on the MOA in regards to MCL 124.509 and the GTLA as well as the jurisdiction of this Court. Plaintiff submits that this Court should affirm Michigan law and Supreme Court precedents on these matters.

72. The result otherwise is that both this Court and Plaintiff are denied a forum by the MOA's operation in a manner where *ultra vires* adoption and structure provide the only vehicle for addressing the matter, which is why the matter is raised here.

73. Plaintiff does not ask this Court to resolve federal constitutional questions unnecessarily, but submits that where state-law *ultra vires* defects operate to deprive courts of jurisdiction, structural constitutional principles must be addressed to preserve judicial availability and authority. Plaintiff will not ask this Court to declare anything federally unconstitutional, but the opposite – to affirm existing precedent on Michigan sovereignty, color of law doctrine, and state court jurisdiction over state officers. Doing so would resolve the constitutional injury.

74. This effects analysis requires some explanation and so the remainder of this Count is divided into two sections for purposes of conceptual clarity. The first deals with the issue of effective forum deprivation and jurisdictional displacing effects – how task-force agreement color of law doctrines in the Sixth Circuit impact this Court and Plaintiff in ways, absent state court guidance, that enable obstruction of binding Supreme Court precedent and Michigan sovereign authority. The second section deals with established Supreme Court precedents, how they resolve these forum and jurisdictional displacing issues, and why affirming them here provides the cleanest way of resolving this case on state-law *ultra vires* grounds, prevent this matter from being capable of repetition yet evading review, while minimizing constitutional findings in keeping with *Ashwander v. TVA*, 297 U.S. 288 (1936).

## SECTION A: THE 287(G) MOA DISRUPTS *EX PARTE YOUNG* REMEDIES, MICHIGAN COURT JURISDICTION, AND IMPLICATES THE STATE LAW *ULTRA VIRES* QUESTIONS

75. For more than a century, *Ex parte Young*, 209 U.S. 123 (1908), has provided the backbone of federal judicial review of unconstitutional state action. *Young* is not a waivable privilege but a constitutional command: states may not insulate their actions or officers from federal injunctive relief, be that in federal or state court. Neither a state nor a municipality may bargain away, contract away, or consent away the courts' authority to halt unconstitutional conduct by state officials.

76. Under *King v. United States*, 917 F.3d 409 (6th Cir. 2019), whether an officer acts under federal or state color depends on the "*source and implementation of authority for the program, not for the particular work that agency chooses, in the*

*exercise of its authority, to perform on a given day."* Under the MOA, Taylor officers are treated as federal employees for liability and immunity purposes *"under federal or state law" (Exhibit E, Section XIV)*. That federalization triggers the FTCA, Westfall Act, and the now-extremely narrow *Bivens* doctrine (see *Ziglar v. Abbasi*, 582 U.S. 120 (2017); *Egbert v. Boule*, 596 U.S. 482 (2022)), meaning any suit must run against the United States—not the state officer.

77. The matter here is not that federal relief does not exist, but rather that federal relief for unconstitutional state action is foreclosed, since direct suit against the states is prohibited by the *Eleventh Amendment,* leaving *Ex parte Young* style relief against the state's enforcers as the avenue for relief structurally obstructed.

78. Indeed, the Supreme Court has long recognized that the identical equitable remedy lies against federal officers who act unconstitutionally or *ultra vires*. *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689-90 (1949); *Philadelphia Co. v. Stimson*, 223 U.S. 605, 620 (1912). The Court has repeatedly described this federal-officer injunction as the direct federal analog to *Ex parte Young*. *Armstrong v. Exceptional Child Center*, 575 U.S. 320, 327 (2015); *Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S.635, 645-46 (2002).

79. The MOA does not merely shift damages liability; it displaces the courts' equitable jurisdiction to enjoin unconstitutional state conduct by placing Taylor officers behind a shield of federal sovereign immunity that *Larson, Young,* and progeny were designed to pierce.

80. The principle was settled over 140 years ago in *United States v. Lee*, 106 U.S. 196 (1882), the direct precursor to *Ex parte Young*. A federal officer's claim of

sovereign immunity cannot defeat a suit for injunctive relief when the officer's actions violate the Constitution. The Court in *Lee* allowed an injunction against federal officials claiming to act under federal authority, holding that "*no man in this country is so high that he is above the law*," and that the judiciary must remain open to vindicate constitutional rights. 106 U.S. at 220.

81. The 287(g) MOA's attempt to federalize Taylor officers and then hide them behind Westfall/FTCA substitution directly contradicts this foundational principle by roadblocking federal judicial review of state actions and legislation which may conflict with the Constitution by redirecting them via a change in legal color.

82. The shift in color of law also removes Michigan officers from the reach of Michigan courts by declaring them to be acting exclusively as federal officers. The Court loses its ability to review the actions of Michigan officers as state sovereign control is effectively displaced, and Plaintiff loses state court as a forum as well as loses a federal forum for relief from unconstitutional acts by state officials, who have been reclassified as being exclusively federal officers – structurally impeding *Ex parte Young* review by state and federal courts alike.

83. Likewise, while this Court can hear federal issues (as it is here), when Taylor officers are substituted with the US government under Westfall substitution, any attempt by this Court to adjudicate their conduct would operate to convert the action into one against the US government, subjecting the claim to federal sovereign immunity and removal doctrines, and thereby substantially impairing this Court's ability to provide effective adjudicatory relief with respect to the

challenged conduct. It also deprives Plaintiff of having their Michigan or federal rights adjudicated before this Court.

84. Even if Michigan wished to do so, it cannot authorize officers to operate in a manner that deprives residents of constitutionally required federal judicial review. States may adjust their own immunity rules, but they cannot remove federal jurisdiction to enjoin unconstitutional state acts. Substitution of federal immunity for Michigan's GTLA (contradicting MCL 124.509 which conditions interlocal contract validity upon preserving liability and immunity) creates a legal regime in which state officials wield state police power while shielded by federal sovereign immunity. That is something Taylor has no constitutional capacity to create.

85. Because the MOA leaves Plaintiff and all Taylor residents without any viable federal remedy against unconstitutional state action as applied here, it creates a *Bond* category structural constitutional injury. Agreements producing such effects exceed municipal and state authority, violate federalism principles, violate the separation of powers, and are void from the moment of execution—regardless of procedural posture or subsequent ratification.

86. The State of Michigan could re-write every immunity law and amend its state constitution to maximize on its sovereign immunity, and would still be subject to federal review under *Ex parte Young*. Cross-deputization results in state officials acting under federal color of law, and when combined with the Westfall Act it thwarts federal judicial review by using federal sovereign immunity to short-circuit *Ex parte Young's* ability to hold state laws accountable to the constitution by their officers. A local-federal agreement which bypasses the structural

constraints of the constitution is itself a violation of the constitution. This also

means that the constitutional question is logically prior to the *ultra vires* issue.

87. This identity shift is not hypothetical. It is a matter of federal Sixth Circuit

precedent. In *King* the court held that a Grand Rapids police detective cross-

deputized into a federal task force "*was an employee of the federal government*

*pursuant to 28 U.S.C. § 2671*" and that "*the United States is the proper defendant*"

for his actions. Id. at 432–33. *King* confirms that when Michigan officers operate

under cross-deputization, they act under color of federal law and they acquire

federal-officer immunity and protections—including Westfall Act substitution—

by operation of federal statute, and lose their state color.

88. In *King*, an FBI agent and the Michigan police officer acted on a Michigan

warrant for Michigan crimes while pursuing a Michigan suspect in Michigan, but

they were considered to be acting under federal color because of a task-force

agreement which shifted the "*source and implementation of authority for the*

*program*" to a federal agency. The constitution was not considered source of

authority, but rather the task-force agreement – program over constitution.

89. This broad interpretation enables federal removal of cases from state court

involving purely state-law offenses, not because of the nature of the law being

enforced, but because the source of authority is treated as federal for purposes of

color of law analysis once a task-force agreement is invoked. Under this

framework, state officers acting pursuant to the agreement are treated as operating

under federal color regardless of the statute enforced, thereby displacing state

court jurisdiction, altering the applicable forum, remedies, and immunities, and rendering underlying state authorization or limits functionally irrelevant.

90. Rather than operating as a reciprocal framework in which federal officers assume state color when enforcing state law and state officers assume federal color when enforcing federal law – each taking on both colors as they operate under both authorities – prevailing interpretations in the lower federal courts treat federal program participation as dispositive, subordinating state color and rendering it non-determinative for jurisdictional and remedial purposes.

91. This doctrinal shift operates to interfere with the jurisdiction of courts as provided under state and federal constitutions, § 1983, and *Ex parte Young* (as examples) by removing state actors from the reach of the courts by changing their color (and with it whom the Court addresses from the officer to the United States under Westfall). Since program-source rather than constitution-source is used by the Sixth Circuit to determine authority, once an agreement goes into effect, all authority is derived from the MOA, cutting out the state as a source of authority.

92. Since, in *King*, lower federal courts place no regard on *"the particular work that the agency chooses, in the exercise of its authority, to perform on a given day"* when determining federal color and excluding state color, the lower federal courts have treated program-source authority as dispositive, with no clear regard for the underlying state authorization. In their interpretation, enforcement of any law, state or federal, falls under federal color with state color removed for the officer, so long as the MOA is the source of authority.

93. As a result, enforcement actions involving purely state law may be re-characterized as federal in nature, permitting removal from state court and altering the forum, remedies, and immunities otherwise available under state law. This effect is not limited to immigration enforcement, but extends to any action taken by officers operating under the MOA, thereby producing an open-ended displacement of judicial authority as a structural consequence of the agreement's invocation – a present and live structural injury to how Plaintiff is governed.

94. The Supreme Court has long held that federal constitutional rights and federal causes of action may not be narrowed, burdened, or effectively nullified by state procedural rules, immunity doctrines, or jurisdictional structuring. See *Howlett v. Rose*, 496 U.S. 356 (1990); *Haywood v. Drown*, 556 U.S. 729 (2009); *Felder v. Casey*, 487 U.S. 131 (1988); *Hanna v. Plumer*, 380 U.S. 460 (1965); *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010).

95. These decisions collectively reflect a structural principle: states cannot design mechanisms that narrow, frustrate, or eliminate the enforcement of federal constitutional rights or access to federal courts. Municipalities, lacking sovereign immunity, are bound by these limitations even more strictly than states. The 287(g) agreement does exactly that – not by statute, but by structure – and in a manner which does not merely impede, but forecloses judicial remedies not just to federal courts, but in this case protection of state or federal rights in this Court.

96. Courts cannot permit a municipality to accomplish through an intergovernmental contract what the Supreme Court has repeatedly forbidden states to do through statute or procedural manipulation: insulate unconstitutional conduct from review.

97. This dynamic is especially dangerous under 287(g). In *Arizona v. United States*, 567 U.S. 387 (2012), state governments were prohibited from creating their own immigration offenses, arresting based on immigration status, enforcing removability rules, or creating its own state-level deportation framework. Michigan could enact unconstitutional immigration provisions that are banned under *Arizona*, and by enforcing them exclusively through 287(g) officers, could perpetually evade all judicial review – state or federal. The *Eleventh Amendment* would prohibit any direct suit against the State, states enforcing their own laws is legal within the state, and immigration enforcement is constitutional when it is federal. A state could enforce its own unconstitutional immigration laws indirectly through 287(g) cross-deputized officers without ever triggering *Ex parte Young* review or § 1983, evading *Arizona's* restrictions in practice. (Plaintiff notes that this hypothetical is for conceptual illustration only.)

98. *Larson* bars suits against federal officials unless they act unconstitutionally or beyond statutory authority, but immigration enforcement is considered constitutional for the federal government, and enforcement of § 1357(g) – including 287(g) agreements – falls within delegated federal authority.

99. Likewise, *King* permitted federal officers not cross-deputized with state authority to enforce state law under that task-force agreement, functionally removing any potential of a federal suit resulting in restrictions on officers acting under federal color who enforce state law – federal color was sufficient even absent federal law, clearing the path for this scenario.

100.     *King* found that it did not matter what laws were enforced, only that the program is federal. Unconstitutional state laws thus could be passed and enforced with impunity since no court could ever declare such laws unconstitutional as they would always appear under color of federal law.

101.     Therefore, if no *ultra vires* action occurs because immigration enforcement is lawful under federal color, and the conduct is treated as authorized federal action, there is no predicate illegality to support damages liability. Once enforcement is classified as federal, § 1983 is unavailable, state constitutional remedies are displaced, and Westfall substitution applies.

102.     In that posture, damages claims face dismissal at the threshold: *Bivens* relief is foreclosed in the immigration context under *Egbert v. Boule*, and FTCA claims fail where the conduct is authorized, discretionary, or lacks a private analogue. Any such dismissal further implicates the FTCA's judgment bar, precluding parallel or subsequent claims arising from the same conduct.

103.     Conduct treated as lawful federal enforcement is insulated from both injunctive relief and damages, leaving no judicial forum in which unconstitutional state action – implemented through federal color – could be reviewed. The courts cannot reach unconstitutional state policy. State courts cannot reach their own officers who have been reclassified as federal. In this posture, *ultra vires* adoption and structure becomes the only mechanism by which the constitutional injury can be brought before the Court – jurisdiction is effectively displaced from all others.

104.     Neither a state nor any sub-unit of a state may remove itself from federal judicial review – *ultra vires* or fully compliant with state law – and yet that is

exactly what the City of Taylor has done through this MOA. Resolving this case on *ultra vires* grounds alone, while correct for Michigan law, would leave the structural and separation of powers problems essential to the judicial power unresolved with no other vehicle available, which is why Plaintiff presents it here.

105.     *Ex parte Young* is not just a remedy – it is the structural mechanism that preserves US Constitution Article III review of unconstitutional state action. It permits injunctive relief only against state officials acting under state authority. Substituting federal color, sovereign immunity, and post hoc damages remedies does not preserve constitutional review – it eliminates the only mechanism by which unconstitutional state action may be prospectively restrained.

106.     Plaintiff may preserve access to federal courts for federal remedies for some matters (though as seen that too can be foreclosed), but structurally loses their legal ability to challenge unconstitutional state action in state or federal court, prospectively or otherwise – a *Bond* style structural injury left active, ongoing, and unremedied. The Incorporation Doctrine is left without an operative enforcement mechanism as to challenge state action in these situations by state or federal courts and state law loses its reach over state officers.

107.     The consequence of an *ultra vires* only remedy not only would leave the constitutional injury unaddressed, but would ensure that any future challenges of local adoptions of 287(g) – that comply state law – would see Westfall substitution for any officer enforcing it. This is the prime example of capable of repetition yet evading review. *Ultra vires* adoption and structure is the only vehicle capable of bringing this issue properly before the Court. This is the reason

why the constitutional issue should be addressed here, and there is a clear
resolution available consistent with longstanding precedent.

108.     *King*, whose program-source rule would deprive this Court of authority
over Michigan officers and deny Plaintiff proper judicial forums, is resolved with
binding Supreme Court precedents which present this Court with a solution of
asserting Michigan's sovereign jurisdiction. That is why this Court should
recognize the application of Supreme Court doctrines of dual-sovereignty and
long-standing precedents pertaining to determining color of law for state action to
maintain and assert Michigan's sovereign control over its own officers and ensure
Plaintiff retains his democratic right of self-governance through his state, access
to state courts, access of state courts, and protection of his federal constitutional
rights under *Ex parte Young* and of his rights under Michigan's Constitution.

## SECTION B: DUAL-SOVEREIGNTY AND COLOR OF LAW DOCTRINES
## RESOLVE THE CONFLICT AND PRESENT AN ACTIONABLE RESOLUTION

109.     The Supreme Court has made clear that sovereign identity is defined by
the independent constitutional source of governmental authority, not by functional
overlap or interlocal agreement. In *Heath v. Alabama*, 474 U.S. 82 (1985), the
Court held that two States remain "separate sovereigns" for all constitutional
purposes – even when they prosecute the same defendant for the same act –
because each State derives its authority from a distinct and independent sovereign
source. *Heath* explains that sovereignty does not merge simply because two
governments act on the same conduct or pursue the same objectives.

110.     This structural rule cannot be reconciled with the effect of the 287(g)

MOA as would be constructed by *King*. In *King*, the Court held that a local officer,

cross-deputized under a federal task-force agreement, acted under federal color of

law not because of what they did on a specific day, but because the "*source and*

*implementation of authority for the program*" derived from a federal deputization.

More importantly, it said that state color is functionally removed.

111.     Under *King's* program-source rule, cross-deputization is treated as

sufficient to transform a state officer into a federal actor for purposes of sovereign

immunity and color substitution. *Heath* by contrast uses a constitution-source rule

for the source of authority. This is the proper and binding standard.

112.      If sovereign identity remains distinct even for double-jeopardy purposes –

where the consequence is a second prosecution for the same capital crime leading

to execution – it cannot be reassigned, blended, or displaced through a municipal

contract with a federal agency. *Heath* informs us that sovereign identity cannot be

altered by cooperation, convenience, or programmatic alignment.

113.     A municipality is not a sovereign (see *Waller v. Florida*, 397 U.S. 387

(1970)), and it has no authority to reclassify its officers into federal actors for

immunity and liability purposes. Nor may a federal agency acquire state officers

into the federal sovereign merely by agreement when the State itself has not

enacted legislation authorizing such a transfer of sovereign identity.

114.     State consent cannot be presumed, nor could even the most generous view

of municipal implied authority overcome the finding in *College Savings Bank v.*

*Florida Prepaid*, 527 U.S. 666 (1999), which held that state sovereign immunity

cannot be waived implicitly. If there is not implicit waiver for sovereign immunity, so it follows there can be no implicit inflating, expanding, blending, or transferring of it either through Westfall substitution.

115.    In *Alden v. Maine*, 527 U.S. 706 (1999), the Supreme Court held that states retained sovereign immunity even in their own courts – so it follows that states would retain their sovereign authority and identity in their own courts. By removing state color of law from officers acting under federal color of law as a consequence of task-force agreements, cases like *King* implicitly neglect this sovereign principle by removing Taylor officers from state court, or prevent them from being treated as state officers in federal court for *Ex parte Young* review.

116.    *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996), likewise recognizes that sovereign immunity is a fundamental attribute of sovereignty. There it was held that to remove sovereign immunity guaranteed under the *Eleventh Amendment*, Congress needed to both explicitly say they were doing so and act under a valid Constitutional power. Neither apply here.

117.    Michigan has passed no law explicitly granting any of this. By the same doctrine consent cannot be implied or inferred, nor can it be taken without explicit Congressional intent and valid Constitutional power to do so – nor does delegated authority by federal statute create new sovereigns (*Puerto Rico v. Sanchez Valle*, 579 U.S. 59 (2016)). Sovereign identity is structural, not transactional.

118.    Nor does the existence of cooperation alter dual-sovereignty. In *Bartkus v. Illinois*, 359 U.S. 121 (1959), the Supreme Court held that cooperation between

federal and state officials did not violate the Double Jeopardy Clause nor the Due Process Clause because of dual-sovereignty.

119.     Likewise, parallel prosecutions by federal and state sovereigns were upheld in *Abbate v. United States*, 359 U.S. 187 (1959) – sovereign authority existed for both for crime and punishment, reaffirmed in *Gamble v. United States*, No. 17-646, 587 U.S. 678 (2019), where the Supreme Court plainly said, "*Held. This Court declines to overturn the longstanding dual-sovereignty doctrine.*"

120.     Distinct sovereign authority is a double-edged sword. Ability to be transgressed against and authority to punish, both presume sovereign identity, and thus preservation of color of law. With state power comes state responsibility.

121.     Nor is sovereign identity limited to cases involving double jeopardy or sovereign immunity. In *Baker v. General Motors Corp.*, 522 U.S. 222 (1998), the Supreme Court held that the *Full Faith and Credit Clause* does not require one sovereign to enforce another sovereign's act in a way that displaces its own law or authority structure.

122.     Similarly in *Franchise Tax Board of California v. Hyatt*, 587 U.S. ___ (2019), sovereign immunity in the courts of other sovereigns was upheld. There the issue of *Full Faith and Credit* was also regarded as not overriding state sovereignty.

123.     Sovereign identity was recognized in the context of dignity and autonomy in yet another context in *Federal Maritime Commission v. South Carolina State Port Authority*, 535 U.S. 743 (2002). There, sovereignty was recognized as

extending beyond judicial proceedings, making clear that sovereign identity is not a narrow principle applied only in select cases:

124.     *"Dual sovereignty is a defining feature of the Nation's constitutional blueprint, and an integral component of the sovereignty retained by the States when they entered the Union is their immunity from private suits… that provision does not define the scope of the States' sovereign immunity; it is instead only one particular exemplification of that immunity. As a result, this Court's assumption that the FMC does not exercise the judicial power of the United States in adjudicating Shipping Act complaints filed by private parties does not end the inquiry whether sovereign immunity applies to such adjudications. Pp. 751-754."*

125.     Subjecting Michigan's officers, liability rules, and remedial framework to another sovereign's control – absent valid state authorization – inflicts a constitutional injury to state dignity independent of enforcement or damages. Under *Bond v. United States*, 564 U.S. 211 (2011), Plaintiff is understood to be injured by that which interferes with the powers reserved to States and the people.

126.     Sovereign identity is covered by applicable of color of law analysis. The quintessential case on color of law is *Screws v. United States*, 325 U.S. 91 (1945). *Screws* held that an officer acting outside their legal authority does not remove their color of law. Acts performed "*under pretense of law*" remain state action, whether they follow, exceed, or act outside of their official authority.

127.     That principle itself long predates *Screws*, such as in *United States v. Classic*, 313 U.S. 299 (1941), holding that, "*Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the*

*authority of state law, is action taken "under color of" state law,"* – and *Ex parte*

*Virginia,* 100 U.S. 339 (1879), holding that, "*Whoever, by virtue of public position*

*under a State government, deprives another of property, life, or liberty, without*

*due process of law, or denies or takes away the equal protection of the laws,*

*violates the constitutional inhibition; and as he acts in the name and for the State,*

*and is clothed with the State's power, his act is that of the State. This must be so,*

*or the constitutional prohibition has no meaning. Then the State has clothed one*

*of its agents with power to annul or to evade it.*"

128.     Thus, to the extent *King's* program-source rationale would treat Taylor

officers as federal actors for immunity and liability purposes, such an application

if extended here would collapse the dual-sovereignty structure *Heath* requires,

*Bartkus* makes clear that cooperation does not negate, *Gamble* illustrates exists

simultaneously at state and federal levels, *Sanchez Valle* forbids from creating

anew from federal statute, *College Savings Bank* spells out isn't implied away,

and *Seminole Tribe* says cannot be stripped (except under very specific

circumstances, not applicable here).

129.     Because participation in 287(g) requires state officers to first possess valid

state-law authority, any federal authority conferred by the MOA to state officers

is necessarily derivative and meets the two-part test established in *Lugar v.*

*Edmondson Oil Co., Inc,* 457 U.S. 922 (1982), for determining state color: "*First,*

*the deprivation must be caused by the exercise of some right or privilege created*

*by the State or by a rule of conduct imposed by the State or by a person for whom*

*the State is responsible... Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor*."

130.     Taylor police officers meet both criteria, and *Screws* establishes state authority is not shed merely by acting outside the bounds of that authority, and cannot displace the state as the primary and original independent constitutional source of the officer's power. Whether the officer acts outside their authority for personal prejudice as in *Screws* or on behalf of another authority as with 287(g) here, they do so first and foremost as an agent of the state – and while *Lugar* dealt with private individuals rather than the federal government, the principle is the same. Just as a person may be prosecuted by two sovereigns for the same act, the same act may implicate multiple sovereign interests without erasing the source of the actor's authority, or in this case, authorities.

131.     *Blockburger v. United States*, 284 U.S. 299 (1932), although governing offense identity rather than sovereign identity, reflects a broader constitutional principle: legal distinctions must be grounded in independent elements rather than labels. Just as *Blockburger* prevents a single offense from being fragmented into multiple crimes absent distinct elements, dual sovereignty doctrine requires sovereign identity rest on an independent source of authority rather than functional labels. Where the same act is attributed to different sovereigns without any independent source element, the distinction collapses.

132.     Thus, when the logic is inverted in application from identifying an offense to identifying the authority as the flip side of the same conceptual coin, the different elements inherent to state versus federal power establishes a clear

distinction in elements of authority identity just as they would for offense identity: federal authority comes from the federal constitution while state authority comes from the state constitution; federal officers have federal color directly, while state officers can only have federal color if they first have state color and an approved MOA; federal laws may govern immigration, while state laws may not.

133. State officer authority requires elements federal officer authority does not, just as "*each of the offenses created requires proof of a different element*" in *Blockburger*. Thus, just as the offenses are distinct, so are the authorities. The act of collapsing authorities is the inverse of double jeopardy in this context.

134. *King's* program-color rule constitutionally cannot be extended into 287(g) without violating *Gamble* or *Heath's* understanding of sovereign identity, over 140 years of precedent on color of law, and would fail every step of double-jeopardy analysis if it were applied there as an inversion to determine distinct authority. Additionally, applying it here would mean allowing task-force officers an exclusive escape hatch from Michigan courts to *Gamble's* authorization of separate sovereign prosecutions by removing officer conduct from their reach.

135. Furthermore, here immigration enforcement is not a violation federally while it would be state, but the MOA defaults to federal color thus eliminating potential for prosecution rather than permitting it to repeat like double jeopardy. Not only is Article III undermined, but a state's ability to prosecute is also obstructed, as officers under federal color cannot be tried in state courts for performing federal tasks. See *In re Neagle*, 135 U.S. 1 (1890).

136.     For a municipality, through cross-deputization via a MOA with a federal

agency, to eliminate Michigan, § 1983, and *Ex parte Young* jurisdiction by

transforming a state officer into a federal one for purposes of sovereign immunity,

inherently begs the question of sovereign authority. The officer is a federal actor –

because they are in a federal program – which they are only in because they are

acting as a federal actor. Put another way: the officer is federal – because they are

performing delegated federal authority – which they only have – because they are

a state officer. *King's* program-source rationale presupposes the conclusion it is

meant to establish. Dual-sovereign identity presents no such logical fallacy.

137.     *Brownback v. King*, 592 U.S. 209, 218-19 (2021), continued the *King* case

to the Supreme Court, but only to deal with a narrow issue pertaining to the

"judgment bar." *Brownback* did not resolve *sub silentio* any questions about dual-

sovereignty upheld explicitly only two years earlier in *Gamble* any more than

*Gamble sub silentio* overruled *King I*, and *Brownback* certainly did not sanction

negating *Ex parte Young* review. This issue therefore remains an open question.

138.     These cases only decided on the issues that these cases explicitly decided

on, even if they implicitly present incongruities. However, *King III* (*King v.

United States*, No. 24-1900 (6th Cir. 2025)), applied the "judgment bar" to a task-

force agreement case, demonstrating a concrete instance that arises when cross-

deputized conduct is treated as federal-only for liability and immunity purposes,

collapsing sovereign identity, and foreclosing judicial forums for redress.

139.     Extending this into 287(g) where any claim would be dismissed as a non-justiciable attempt to challenge lawful federal immigration authority shows why *King* is the wrong framework to apply, as it would guarantee closing Court doors.

140.     Finally, any reliance on federal color-of-law doctrine demonstrates why authorization is indispensable. If sovereign identity is accepted as transferrable by an MOA between the City and the federal government, then state-law limits on authority would be made structurally meaningless. This includes who may sign the agreement, incur expenditures, if state immunity statutes apply, if the Michigan Constitution can restrict state officers from any aspect of the MOA such as issuing federal administrative search and seizure warrants (*Exhibit E, Sec. V*), or even if legislative prerequisites for entering into the MOA in the first place under the Urban Cooperation Act or any law could actually bind in the face of federal sovereignty. A theory that renders state governance optional, saying that the same Michigan Constitution that gives this Court its authority also gives its municipalities the power to bypass it – is not a theory this Court need accept.

141.     Dual-sovereignty and established color of law precedents preserve independent constitutional accountability. When functional program-source task-force doctrines are extended structurally, that independence collapses: the same conduct is attributed to the federal sovereign for immunity and remedial purposes, while the state's constitutional accountability mechanisms are displaced, and with it any review of its actions or by its courts.

142.     The result is not dual accountability, but remedial consolidation into a single sovereign – a result *Gamble, Screws, Seminole Tribe of Florida,* and

numerous related precedents forbid.  Not only is Plaintiff structurally injured, but this Court and federal courts are deprived of judicial review of state action structurally for these cases by means of contractual sleight of hand.

143.     Accordingly, where functional task-force cases proceed on unexamined assumptions about sovereign identity, the Court should look to controlling structural precedent – dual sovereignty and color-of-law doctrine – to resolve the constitutional question presented. *Gamble*, *Screws*, *Ex parte Young*, and related precedents provide a proper structural guide here as they enable a clean *ultra vires* ruling on state law while asserting Michigan's sovereign control over its own judicial jurisdiction. Michigan law can only bind its municipalities and officers if Michigan retains its sovereign identity and jurisdiction.

144.     Plaintiff asks this court for nothing novel, only to apply decades of Supreme Court precedent to preserve his access to this Court by affirming dual sovereignty. The effects analysis has been lengthy, but the request is orthodox and straight-forward: affirm this Court's jurisdiction over municipalities and their officers as provided by Article VI of the Michigan Constitution by declaring that state officers retain their state color. This resolves Plaintiff's constitutional injury.

145.     In *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), the Supreme Court held that federal courts sitting in diversity must apply state substantive law. Absent clarification from this Court, task-force agreements of this kind risk being construed to eliminate state color for state officers when they add federal color during cooperation with federal officials, thereby removing Michigan officers from state courts notwithstanding the non-transferrable nature of sovereignty.

146.     Sovereignty is structural identity and the very source of authority – it is

not a transactional bargaining chip for the City of Taylor to exchange for federal

immunities or tools otherwise denied to them by the State of Michigan. Plaintiff

asks for no overturning of precedent, but affirmance of precedent, jurisdiction,

color of law, and sovereign identity principles of the Michigan and United States

Constitutions to counteract effective forum deprivation in case of this or a similar

MOA reoccurrence – which has already occurred in similar cases, like *King*,

where lower federal courts proceeded to apply Michigan law in the absence of

Michigan guidance. Plaintiff asks this Court to provide that needed guidance.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:


A. Declare that the Memorandum of Agreement executed between Defendant City of

Taylor and federal authorities was entered into without lawful municipal authority, and is

*ultra vires* and *void ab initio* under Michigan law;

B. Declare that Defendant lacks authority to implement, fund, or operate under the

agreement absent valid legislative authorization and appropriation by the City Council;

C. Enjoin Defendant City of Taylor from enforcing or relying upon the agreement;

D. Declare that Defendant may not adopt, enforce, rely upon, ratify, re-execute, or

implement any agreement, memorandum, task-force participation, cross-designation, or

delegation of authority having the same legal effect as the challenged MOA, regardless of

form or title, absent full compliance with Michigan law, Michigan Constitution, and the orders of this Court;

E. Declare that no municipal funds may be expended, obligated, reimbursed, incurred, or committed under the challenged agreement or any successor agreement lacking lawful authorization.

F. Affirm Michigan's sovereign jurisdiction over state officers and laws, and that state color of law remains attached to any officer enforcing state law, employed by Michigan, or enforcing Michigan law via contract, regardless of concurrent federal authorization.

G. Declare that any purported transfer or displacement of state authority, immunity, or accountability arising from the agreement, or any other agreement with similar effects, is without legal effect as a matter of state law;

H: Declare that any municipal agreement with terms that conflict with Michigan law or the Michigan Constitution are null and void;

I. Declare that, as a matter of state law and structural federalism principles, the addition of federal color of law through intergovernmental cooperation does not negate or displace existing state color of law, authority, or Michigan court jurisdiction over state officers.

J. Declare that Michigan courts retain jurisdiction over Michigan officers enforcing Michigan law or employed by Michigan law enforcement agencies notwithstanding any intergovernmental agreement or assertion of federal color of law.

K. Declare that the unlawful provisions of the agreement are not severable, and that the agreement fails as a whole.

L. Retain jurisdiction to enforce and interpret the Court's declaratory and injunctive relief.

M. Grant such other relief as the Court deems just and proper.

Respectfully submitted,

/s/ Timothy Kachinski

Timothy Kachinski

Plaintiff, Pro Se

8246 Robert St.

Taylor, MI 48180

734-775-1810

tkachins@gmail.com

Dated: _ 1/05/2026 _

## EXHIBIT A: SUPPLEMENTAL INDEX OF CITY COUNCIL MEETING VIDEOS & MINUTES

In support of Plaintiff's Complaint, Plaintiff hereby provides the following index of Taylor City Council meetings prepared by Plaintiff, identifying where public requests for a vote on the 287(g) agreement were made, including from the Board of Education, and noting the absence of any council action as well as concerns about other acts of executive overreach. Video recordings of all meetings can be accessed from this link under the City Council tab under Available Archives: https://www.cityoftaylor.com/1418/Virtual-Meetings

| Date | Time Stamp | Description | Minutes Link |
|---|---|---|---|
| May 6, 2025 | [02:50:38]-[02:57:30];<br><br>[03:06:12]-[03:07:44] | Public inquiries about 287(g), complaints about why the police chief did it without vote. City Council members and the Mayor note that they were not notified prior – police chief takes responsibility for not notifying. No action on 287(g). | https://cityoftaylor.com/AgendaCenter/ViewFile/Minutes/_05062025-662<br><br>---------------------------------------------<br><br>More details on this meeting available in *Exhibit B*. |
| May 20, 2025 | [02:00:02]-[02:06:29] | Public requests for vote on 287(g). No action on 287(g) | https://cityoftaylor.com/AgendaCenter/ViewFile/Minutes/_05202025-664 |
| June 3, 2025 | No Quorum | Meeting recessed, no action on 287(g) | https://cityoftaylor.com/AgendaCenter/ViewFile/Agenda/_06032025-666 |
| June 5, 2025 | Special Meeting | No action taken on 287(g), linked video appears to be a duplicate of a previous meeting with additional unrelated content added. | https://docs.google.com/gview?url=https%3A%2F%2Ftaylor.granicus.com%2FDocumentViewer.php%3Ffile%3Dtaylor_135993a9771c9b62f37f66dc2e9516d6.pdf%26view%3D1&embedded=true |
| June 17, 2025 | [01:04:32]- | Public comments urging | https://cityoftaylor.com/AgendaCente |

| | [01:13:40]; [01:24:02]-[01:25:24] | vote, Taylor Board of Education presents resolution opposed to 287(g), Council informed of ultra vires signature by Chief Blair is a violation of Michigan Home Rule City Act and City Charter by resident, no council action on 287(g) | r/ViewFile/Minutes/_06172025-670 <br><br> -------------------------------------------- <br><br> More details on this meeting available in *Exhibit C.* |
|---|---|---|---|
| July 1, 2025 | [03:38:28]-[03:39:42] | Request for vote on 287(g), no council action taken on 287(g) | https://cityoftaylor.com/AgendaCenter/ViewFile/Minutes/_07012025-672 |
| July 15, 2025 | [01:49:33]; [01:52:13]; [01:52:19]-[01:53:55] | Formal complaint about unlawful unilateral towing contract signed by the Mayor without council approval. Mayor openly admits to it in pattern of executive overreach. Public request for a vote on 287(g). No action on 287(g) from the council. | https://docs.google.com/gview?url=https%3A%2F%2Ftaylor.granicus.com%2FDocumentViewer.php%3Ffile%3Dtaylor_381998f18ab7ea6d5d627fdc93c0c562.pdf%26view%3D1&embedded=true |
| August 6, 2025 | | No council action taken on 287(g) | https://docs.google.com/gview?url=https%3A%2F%2Ftaylor.granicus.com%2FDocumentViewer.php%3Ffile%3Dtaylor_9a4cf4012944f4d1fc83c3aae0af9073.pdf%26view%3D1&embedded=true |
| August 11, 2025 | No Quorum | Meeting recessed, no action on 287(g) | (video, no minutes) https://taylor.granicus.com/MediaPlayer.php?view_id=1&clip_id=400 |
| August 19, 2025 | | No council action taken on 287(g) | https://docs.google.com/gview?url=https%3A%2F%2Ftaylor.granicus.com%2FDocumentViewer.php%3Ffile%3Dtaylor_514790e2402aa7bff5f8be4a915070ad.pdf%26view%3D1&embedded=true |
| September 2, 2025 | | No council action taken on 287(g) | https://docs.google.com/gview?url=https%3A%2F%2Ftaylor.granicus.com%2FDocumentViewer.php%3Ffile%3Dtaylor_f736d5c33847883d23bdef9aabb3042c.pdf%26view%3D1&embedded=true |
| September 16, 2025 | | No council action taken on 287(g) | https://docs.google.com/gview?url=https%3A%2F%2Ftaylor.granicus.com |

| | | | |
|---|---|---|---|
| | | | %2FDocumentViewer.php%3Ffile%3Dtaylor_6da0a0774b51c69ebcfa34326309358b.pdf%26view%3D1&embedded=true |
| October 7, 2025 | | No council action taken on 287(g) | (video, minutes link non-functional) https://taylor.granicus.com/MediaPlayer.php?view_id=1&clip_id=408 |
| October 21, 2025 | | No council action taken on 287(g) | https://docs.google.com/gview?url=https%3A%2F%2Ftaylor.granicus.com%2FDocumentViewer.php%3Ffile%3Dtaylor_d7b2fc9c5c6fbee0c8204db7bd320642.pdf%26view%3D1&embedded=true |
| November 5, 2025 | | No council action taken on 287(g) | https://docs.google.com/gview?url=https%3A%2F%2Ftaylor.granicus.com%2FDocumentViewer.php%3Ffile%3Dtaylor_7616b203b027e73b9c5b23e40b4eb26a.pdf%26view%3D1&embedded=true |
| November 18, 2025 | | New council seated post-election. Only one council member returned (Johnson) with six newly elected members. No council action taken on 287(g) | https://docs.google.com/gview?url=https%3A%2F%2Ftaylor.granicus.com%2FDocumentViewer.php%3Ffile%3Dtaylor_82a764b8db297709626318a873d396e9.pdf%26view%3D1&embedded=true |
| December 2, 2025 | | No council action taken on 287(g) | (video, no minutes posted) https://taylor.granicus.com/MediaPlayer.php?view_id=1&clip_id=416 |
| December 16, 2025 | | No council action taken on 287(g) | (video, no minutes posted) https://taylor.granicus.com/MediaPlayer.php?view_id=1&clip_id=418 |

**Notes:**

1. No council vote occurred on any of these dates to approve, ratify, repeal, or even formally consider the 287(g) agreement. All meetings since MOA enactment up to the filing of this Complaint are documented.

2. The first several months are documented here with select notes prepared by Plaintiff summarizing. Additional details on meetings can be accessed and assessed independently using the previously cited link to the official archives.

3.  Video timestamps reflect public comment periods where speakers—on the record—requested formal action, including the elected members of the Taylor Board of Education who presented a formal resolution calling for termination of the MOA and expressing opposition. Video links available through the official archives.

4.  Plaintiff can update this index with additional dates, minutes, or transcripts as needed. The purpose of this sample is to demonstrate the absence of a vote.

Respectfully submitted,


Timothy Kachinski, Pro Se Plaintiff


Dated:   __1/5/2026__

EXHIBIT B

Transcript Excerpts from Taylor City Council Meeting prepared by Plaintiff.

(May 6th 2025)

This exhibit contains verified transcript excerpts from the publicly available May 6th, 2025, Taylor City Council meeting, sourced from:

https://taylor.granicus.com/MediaPlayer.php?view_id=1&clip_id=380

These excerpts confirm:

- That the 287(g) agreement was signed without notifying the Mayor or City Council;
- That the City Council learned of the agreement only after it was already executed;
- That the Taylor Police Department has had multiple contacts with ICE, confirming that 287(g) enforcement is likely to continue;
- That the Police Chief invoked loss of federal funding and protections if the agreement were rejected, indicating possible federal pressure and misrepresentation.

- [02:36:30 - 02:37:39] Police Chief JOHN BLAIR:

Let me give you a quick history lesson. The 287 program was adopted way back under President Bill Clinton in 1996. All this program did was allow local municipalities to ask to act as Task Force Agents with various different federal agencies. We have been signing into these agreements with our last five Chiefs of Police. These Task Forces could be with the DEA, it could be with ICE, it could be with what used to be called Border Patrol, any one of the federal agencies we join Task Forces with. Those Task Forces our officers were assigned full time out to those federal agencies. That would be their daily responsibility. They would act under the guise and authority of those federal agencies. This particular agreement we signed into DOES NOT send an officer of the City of Taylor to anywhere. It DOES NOT change anything we have been doing for the last 34 years since I walked through the door.

- [02:37:59 - 02:40:02] Chief JOHN BLAIR:

Under this agreement when we bring [someone accused of a crime] to the station and we run them and we find out they are illegally in this country, we will pick up the phone and notify ICE. That's all this agreement does. If we turn down this agreement we will lose the possibility of federal funding. They have already voted in the House in the State of Michigan to remove revenue sharing if we don't cooperate with this. We will lose free 40 hours of training to our officers about the new immigration laws. These are things that are

unconscionable to me. We will also lose civil tort protection for our officers if they had to enforce anything under immigration if we turn down this agreement. It does not cost us a penny.

- [02:41:12 - 02:41:41] Councilman CHARLEY JOHNSON & Chief JOHN BLAIR:

Councilman Johnson: "I appreciate what you just said. My only concern is with the state of the country right now and what's going on, and you know what I'm talking about, I didn't know about it. I've been around 20 years and you know, working for the city and volunteering and I never heard that before. So I just think it would have been nice if the council had a heads up. Because we're getting bombarded."

Chief JOHN BLAIR: "Right. I accept full responsibility for that."

- [02:42:12 - 02:42:56] Police Chief JOHN BLAIR:

I want to explain one other thing to these people who don't understand this. We have tremendous relationships with our federal partners. Local departments, State departments, and federal. They give us hundreds of free hours of service to this community a year. Our Taylor fireworks, our car cruise, any major crime we have - a homicide, our sex trafficking strings that we run - free. We had 20 agents not six months ago in our department to help us apprehend child sex predators - I would think everyone agrees to. We're going to wash all of that away for an agreement for something we've been doing for over 30 years? For us picking up a phone and calling and reporting someone? That's rough.

- [02:42:57 - 02:43:31] Mayor TIM WOOLLEY:

Just to kind of jump in here and kind of touch on what Councilman Johnson said, I kind of agree. I was first notified on Friday evening, and well somebody texted me, the first thing I said was this is the first I'm hear of this, because I never heard of it or knew of it either. And I called John, you know, and he told me he was out of town, so I felt bad about that, but he said 'no, I'm good', so he went into the explanation and everything, and I said 'John, well a little heads up would have been nice.'

- [02:44:30 - 02:44:45] Mayor TIM WOOLLEY & Police Chief JOHN BLAIR:

Mayor Woolley: "John, let me ask you a question. Excuse me, Chief. When you signed us up for this training did they say 'congratulations! You're the first city in Taylor, or the first city in Michigan, to sign up for this?'"

Police Chief John Blair: "No Mr Mayor, it was a cold call to my office from one of the ICE people we deal with all the time."

Mayor Woolley: "Okay, so you had no idea."

- [02:47:35 – 02:48:28] Chief JOHN BLAIR:
  In 2024 our records division was able to provide me with 3 instances where we did immigration enforcement, where we had contact with people who were considered illegal. 2 of them we contacted ICE, and ICE picked them up. The third one was a victim in a crime and we did not contact ICE. This year we've had 4. We've contacted ICE on all 4 of them, and ICE picked up on 3 of them. We're not talking hundreds of instances here. This is what happens in the city. We are not searching for people. I cannot say that enough. I have a lawful responsibility to follow federal law just as well, and that's all we're doing.

EXHIBIT C

June 17, 2025 — Taylor City Council Meeting

Source: Video Recording of Council Meeting – Taylor, MI (June 17, 2025)
https://taylor.granicus.com/MediaPlayer.php?view_id=1&clip_id=393

This exhibit contains selected excerpts from the publicly available video recording of the
Taylor City Council meeting held on June 17, 2025. The content has been transcribed and
annotated by the plaintiff for evidentiary purposes, with timestamps corresponding to the
official meeting recording.

All transcript entries are formatted as follows:

*[hh:mm:ss] SPEAKER NAME: Transcript excerpt here.*

**TRANSCRIPT EXCERPTS**

[00:00:42 to 00:01:16] PASTEUR DAVE ALVAREZ: "Grant each council member clarity
of thought, kindness of spirit, and courage to do what is right for all people they serve. In
moments of disagreement, help them seek understanding. In moments of uncertainty,
help them seek truth. May every decision made here be rooted in fairness, guided by
integrity, and aimed at building a stronger, safer, and more compassionate community."

[00:01:41 to 00:02:27] COUNCIL CHAIRMAN DOUGLAS GEISS: "Pasteur Alvarez? If
I could, um. Just looking at your name and, uh, a little bit of an accent, I'd like to ask you
a couple questions if that's okay."

PASTEUR DAVE ALVAREZ: "Yes, please."

COUNCIL CHAIRMAN DOUGLAS GEISS: "Can you tell us where you were originally
born?"

PASTEUR DAVE ALVAREZ: "I was born in the Philippines."

COUNCIL CHAIRMAN DOUGLAS GEISS: "The Philippines. And how long have you
lived in Taylor?"

PASTEUR DAVE ALVAREZ: "In Taylor? Since 2000."

COUNCIL CHAIRMAN DOUGLAS GEISS: "Since 2000. Have you found this to be a
welcoming community?"

PASTEUR DAVE ALVAREZ: "I didn't want to leave Taylor. I always had an opportunity to go and, uh, other cities. But this is where I came all the way from, actually, from the Philippines to New York, and then New York to Taylor. And that's it, I'm going to settle here."

[01:08:00 to 01:09:23] COUNCIL CHAIRMAN DOUGLAS GEISS: "Please come forward."

STUDENT ERIN HANSON: "Hello, my name is Erin Hanson, I don't have an address for you guys, sorry. Why are we letting ICE do their bullshit here? I want to know. I want to know why we're having ICE here. Because this is Taylor, Michigan. I know we're considered Taylor Tucky and trailer trash, but I want to know-"

COUNCIL CHAIRMAN DOUGLAS GEISS (interrupting): "Maybe only you."

STUDENT ERIN HANSON: "No! You guys definitely are. I'm not from Taylor, so, I don't care. Listen-"

COUNCIL CHAIRMAN DOUGLAS GEISS (interrupting): "Okay, I'm going to let you speak. You've got two and a half minutes. I will point out that you started this by clapping for the previous person, if you want that same respect, you're going to have people boo you-"

STUDENT ERIN HANSON: "I have never been respected by anyone in Taylor!"

*Meeting becomes chaotic*

[01:09:23 to 01:12:59]

BOARD OF EDUCATION PRESIDENT LINDA MOORE: "My name is Linda Moore, I'm President of the Taylor Board of Education. On June 4th, 2025 we adopted a resolution, and let me preface by saying this resolution was not to vilify, impede working relations with the City, it was just to voice our opinion – and that's what resolutions do. So anyway, at this point I'd like to read the resolution to you for those who haven't seen it, and as you'll see it's pretty benign, but we are very concerned about the ICE agreement.

Where pursuant to section 287(g) of the illegal immigration reform and responsibility act of 1996, on April 23rd, 2025, the City of Taylor police department entered into an agreement with the United States Immigration and Customs Enforcement, known as ICE. Where as pursuant to the public information available ICE's website as of May 29th, 2025, the City of Taylor police department is the only law enforcement agency designated as a municipality in the State of Michigan to have entered into such an agreement with ICE.

Where as the updated agreement with ICE designates specific functions to the personnel of the Taylor police department, including but not limited to the following:

Officers of the Taylor police department under direction of ICE will perform certain functions of an immigration officer, including the power to arrest and detain individuals for violations of the immigration law, and the power to serve and execute warrants of arrest for immigration violations.

Number two – the City of Taylor will now be responsible for salaries of the Taylor officers that are working with ICE on an immigration case.

Three – ICE will now have access to the City of Taylor IT system, which contains names, addresses, and contact information of city residents. Where as North Lake Correctional Facility in Baldwin, Michigan, is being reopened as an immigration detention center to house immigrants, including but not limited to the State of Michigan, and could include residents from the City of Taylor community.

Now therefore be it resolved as follows: the Board does not agree with or condone the City of Taylor or its police department's decision to enter into an updated ICE agreement. The Board believes this agreement will be detrimental to the community. The Board believes this agreement will jeopardize the physical and emotional well being of Taylor children and families. To ensure the safety and well being of the Taylor community, the Board of Education requests that Mayor Woolley, the Taylor City Council, and the City of Taylor police department, and the Chief of Police John Blair, terminate the 287(g) immigration and nationality act agreement, effective immediately. The Board directs the City of Taylor and the City of Taylor police department not to engage in any functions on district property or with district students at the city…"

COUNCIL CHAIRMAN DOUGLAS GEISS: "You are at three minutes."

BOARD OF EDUCATION PRESIDENT LINDA MOORE: "One more sentence and I'll be finished. Mr. Geiss, Chairman Geiss. Its personnel or officers aren't authorized to engage in pursuant to the agreement with ICE. Let it be further resolved that the Taylor Board of Education will continue to educate, nurture, and protect all Taylor school district students and the staff to the best of our ability.

And that was our, the Board of Education, expressing their concerns and voicing our opinion. Thank you."

# EXHIBIT D

Statement by Chief John Blair – Taylor Police Department

Source: FOX 2 Detroit – "Taylor Police Department enters ICE agreement"

Link: https://www.fox2detroit.com/news/taylor-police-department-enters-ice-agreement

"None of our officers are going to be going to jail for subverting the efforts of the federal government and enforcing illegal immigration," said Blair. "I'm not going to jail for violating the law. I'm sorry, it's not going to happen. I think that's common sense."

# Exhibit E

Executed 287(g) MOA Between Taylor PD and ICE

## MEMORANDUM OF AGREEMENT
### 287(g) Task Force Model

This Memorandum of Agreement (MOA) constitutes an agreement between United States Immigration and Customs Enforcement (ICE), a component of the Department of Homeland Security (DHS), and the City of Taylor Michigan Police Department , pursuant to which ICE delegates to nominated, trained, and certified officers or employees of the City of Taylor Michigan Police Department (hereinafter interchangeably referred to as "Law Enforcement Agency" (LEA)), the authority to perform certain immigration enforcement functions as specified herein. The LEA represents City of Taylor Michigan Police Department in the implementation and administration of this MOA. The LEA and ICE enter into this MOA in good faith and agree to abide by the terms and conditions contained herein. The ICE and LEA points of contact for purposes of this MOA are identified in Appendix A.

### I.     PURPOSE

The purpose of this MOA is to set forth the terms and conditions pursuant to which selected LEA personnel (participating LEA personnel) will be nominated, trained, and thereafter be approved by ICE to perform certain functions of an immigration officer under the direction and supervision of ICE within the LEA's jurisdiction. This MOA sets forth the scope of the immigration officer functions that DHS is authorizing the participating LEA personnel to perform. Nothing contained herein shall otherwise limit the jurisdiction and powers normally possessed by participating LEA personnel as members of the LEA. However, the exercise of the immigration enforcement authority granted under this MOA to participating LEA personnel shall occur only as provided in this MOA. This MOA also describes the complaint procedures available to members of the public regarding immigration enforcement actions taken pursuant to this agreement by participating LEA personnel.

### II.    AUTHORITY

Section 287(g) of the Immigration and Nationality Act (INA), codified at 8 U.S.C. § 1357(g), as amended by the Homeland Security Act of 2002, Public Law 107-276, authorizes the Secretary of Homeland Security, or her designee, to enter into written agreements with a State or any political subdivision of a State so that qualified officers and employees can perform certain functions of an immigration officer. This MOA constitutes such a written agreement.

### III.   POLICY

This MOA sets forth the scope of the immigration officer functions that DHS is authorizing the participating LEA personnel to perform. It sets forth with specificity the duration of the authority conveyed and the specific lines of authority, including the requirement that participating LEA personnel be subject to ICE direction and supervision while performing delegated immigration officer functions pursuant to this MOA. For the purposes of this MOA, ICE officers will provide direction and supervision for participating LEA personnel only as to immigration enforcement functions as authorized in this MOA. The LEA retains supervision of all other aspects of the employment and performance of duties of participating LEA personnel.

City of Taylor Michigan Police Department          1                    Revised 03/07/2025

## IV.    TRAINING AND ASSIGNMENTS

Before participating LEA personnel receive authorization to perform immigration officer functions granted under this MOA, they must successfully complete mandatory training on relevant administrative, legal, and operational issues tailored to the immigration enforcement functions to be performed as provided by ICE instructors and thereafter pass examinations equivalent to those given to ICE officers. The mandatory training may be made available to the LEA in both in-person and online, recorded or virtual-meeting formats, as determined by ICE. Only participating LEA personnel who are nominated, trained, certified, and authorized, as set out herein, have authority pursuant to this MOA to conduct the delegated immigration officer functions, under ICE direction and supervision, enumerated in this MOA.

Upon the LEA's agreement, participating LEA personnel performing immigration-related duties pursuant to this MOA will be assigned to various units, teams, or task forces designated by ICE.

## V.    DESIGNATION OF AUTHORIZED FUNCTIONS

For the purposes of this MOA, participating LEA personnel are authorized to perform the following functions pursuant to the stated authorities, subject to the limitations contained in this MOA:

- The power and authority to interrogate any alien or person believed to be an alien as to his right to be or remain in the United States (INA § 287(a)(1) and 8 C.F.R. § 287.5(a)(l)) and to process for immigration violations those individuals who have been arrested for State or Federal criminal offenses.

- The power and authority to arrest without a warrant any alien entering or attempting to unlawfully enter the United States in the officer's presence or view, or any alien in the United States, if the officer has reason to believe the alien to be arrested is in the United States in violation of law and is likely to escape before a warrant can be obtained. INA § 287(a)(2) and 8 C.F.R. § 287.5(c)(1). Subsequent to such arrest, the arresting officer must take the alien without unnecessary delay for examination before an immigration officer having authority to examine aliens as to their right to enter or remain in the United States.

- The power to arrest without warrant for felonies which have been committed and which are cognizable under any law of the United States regulating the admission, exclusion, expulsion, or removal of aliens, if the officer has reason to believe the alien to be arrested is in the United States in violation of law and is likely to escape before a warrant can be obtained. INA § 287(a)(4) and 8 C.F.R. § 287.5(c)(2).

- The power to serve and execute warrants of arrest for immigration violations under INA § 287(a) and 8 C.F.R. § 287.5(e)(3).

- The power and authority to administer oaths and to take and consider evidence (INA § 287(b) and 8 C.F.R. § 287.5(a)(2)) to complete required alien processing to include fingerprinting,

photographing, and interviewing, as well as the preparation of affidavits and the taking of sworn statements for ICE supervisory review.

- The power and authority to prepare charging documents (INA § 239, 8 C.F.R. § 239.1; INA § 238, 8 C.F.R § 238.1; INA § 241(a)(5), 8 C.F.R § 241.8; INA § 235(b)(l), 8 C.F.R. § 235.3) including the preparation of the Notice to Appear (NTA) or other charging document, as appropriate, for the signature of an ICE officer for aliens in categories established by ICE supervisors.

- The power and authority to issue immigration detainers (8 C.F.R. § 287.7) and I-213, Record of Deportable/Inadmissible Alien, for aliens in categories established by ICE supervisors.

- The power and authority to take and maintain custody of aliens arrested by ICE, or another State or local law enforcement agency on behalf of ICE. (8 C.F.R. § 287.5(c)(6))

- The power and authority to take and maintain custody of aliens arrested pursuant to the immigration laws and transport (8 C.F.R. § 287.5(c)(6)) such aliens to ICE-approved detention facilities.

## VI.     RESOLUTION OF LOCAL CHARGES

The LEA is expected to pursue to completion prosecution of any state or local charges that caused the alien to be taken into custody. ICE may assume custody of aliens who have been convicted of a state or local offense only after such aliens have concluded service of any sentence of incarceration. The ICE Enforcement and Removal Operations Field Office Director or designee shall assess on a case-by-case basis the appropriate actions for aliens who do not meet the above criteria based on special interests or other circumstances after processing by the LEA.

After notification to and coordination with the ICE supervisor, the alien whom participating LEA personnel have determined to be removable will be arrested on behalf of ICE by participating LEA personnel and be transported by the LEA on the same day to the relevant ICE detention office or facility.

## VII.    NOMINATION OF PERSONNEL

The chief officer of the LEA will nominate candidates for initial training and certification under this MOA. For each candidate, ICE may request any information necessary for a background check and to evaluate a candidate's suitability to participate in the enforcement of immigration authorities under this MOA. All candidates must be United States citizens. All candidates must have at least two years of LEA work experience. All candidates must be approved by ICE and must be able to qualify for appropriate federal security clearances and access to appropriate DHS and ICE databases/systems and associated applications.

Should a candidate not be approved, a substitute candidate may be submitted if time permits such substitution to occur without delaying the start of training. Any subsequent expansion in the number of participating LEA personnel or scheduling of additional training classes may be based

on an oral agreement of the parties but will be subject to all the requirements of this MOA.

## VIII.    TRAINING OF PERSONNEL

ICE will provide participating LEA personnel with the mandatory training tailored to the immigration functions to be performed. The mandatory training may be made available to the LEA in both in-person and online, recorded or virtual-meeting formats, as determined by ICE.

Training will include, among other things: (i) discussion of the terms and limitations of this MOA; (ii) the scope of immigration officer authority; (iii) relevant immigration law; (iv) the ICE Use of Force Policy; (v) civil rights laws; (vi) the detention of aliens; (vii) public outreach and complaint procedures; (viii) liability issues; (ix) cross-cultural issues; and (x) the obligations under federal law, including applicable treaties or international agreements, to make proper notification upon the arrest or detention of a foreign national.

Approximately one year after the participating LEA personnel are trained and certified, ICE may provide additional updated training on relevant administrative, legal, and operational issues related to the performance of immigration officer functions, unless either party terminates this MOA pursuant to Section XVIII below. Local training on relevant issues will be provided on an ongoing basis by ICE supervisors or a designated team leader.

## IX.    CERTIFICATION AND AUTHORIZATION

ICE will certify in writing the names of those LEA personnel who successfully complete training and pass all required testing. Upon certification, ICE will provide the participating LEA personnel with a signed authorization to perform specified functions of an immigration officer for an initial period of two years from the date of the authorization. ICE will also provide a copy of the authorization to the LEA. The ICE supervisory officer, or designated team leader, will evaluate the activities of all personnel certified under this MOA.

Authorization of participating LEA personnel to act pursuant to this MOA may be revoked at any time and for any reason by ICE or the LEA. Such revocation will require notification to the other party to this MOA within 48 hours. The chief officer of the LEA and ICE will be responsible for notification of the appropriate personnel in their respective agencies. The termination of this MOA, pursuant to Section XVIII below, shall constitute revocation of all immigration enforcement authorizations delegated herein.

## X.    COSTS AND EXPENDITURES

Participating LEA personnel will carry out designated functions at the LEA's expense, including salaries and benefits, local transportation, and official issue material. Whether or not the LEA receives financial reimbursement for such costs through a federal grant or other funding mechanism is not material to this MOA.

ICE is responsible for the installation and maintenance of the Information Technology (IT) infrastructure. The use of the IT infrastructure and the DHS/ICE IT security policies are

defined in the Interconnection Security Agreement (ISA). The ISA is the agreement between ICE's Chief Information Security Officer and the LEA's Designated Accreditation Authority. The LEA agrees that each of its sites using an ICE-provided network access or equipment will sign the ISA, which defines the DHS ICE 4300A Sensitive System Policy and Rules of Behavior for each user granted access to the DHS network and software applications. Failure to adhere to the terms of the ISA could result in the loss of all user privileges.

The LEA is responsible for personnel expenses, including, but not limited to, salaries and benefits, local transportation, and official issue material used in the execution of the LEA's mission. ICE will provide instructors and training materials. The LEA is responsible for the salaries and benefits, including any overtime, of all its personnel being trained or performing duties under this MOA and of those personnel performing the regular functions of the participating LEA personnel while they are receiving training. ICE is responsible for the costs of the LEA personnel's travel expenses while in a training status, as authorized by the Federal Travel Regulation and the ICE Travel Handbook. These expenses include housing, per diem and all transportation costs associated with getting to and from training. ICE is responsible for the salaries and benefits of all ICE personnel, including instructors and supervisors.

The LEA is responsible for providing all administrative supplies (e.g. paper, printer toner) necessary for normal office operations. The LEA is also responsible for providing the necessary security equipment, such as handcuffs, leg restraints, etc.

## XI. ICE SUPERVISION

Immigration enforcement activities conducted by participating LEA personnel will be supervised and directed by ICE. Participating LEA personnel are not authorized to perform immigration officer functions except when working under the supervision or direction of ICE.

When operating in the field, participating LEA personnel shall contact an ICE supervisor at the time of exercising the authority in this MOA, or as soon as is practicable thereafter, for guidance. The actions of participating LEA personnel will be reviewed by the ICE supervisory officers on an ongoing basis to ensure compliance with the requirements of the immigration laws and procedures and to assess the need for additional training or guidance for that specific individual.

For the purposes of this MOA, ICE officers will provide supervision of participating LEA personnel only as to immigration enforcement functions. The LEA retains supervision of all other aspects of the employment of and performance of duties by participating LEA personnel.

In the absence of a written agreement to the contrary, the policies and procedures to be utilized by the participating LEA personnel in exercising these authorities shall be DHS and ICE policies and procedures, including the ICE Use of Force Policy. However, when engaged in immigration enforcement activities, no participating LEA personnel will be expected or required to violate or otherwise fail to maintain the LEA's rules, standards, or policies, or be required to fail to abide by restrictions or limitations as may otherwise be imposed by law unless doing so would violate

federal law.

If a conflict arises between an order or direction of an ICE supervisory officer and LEA rules, standards, or policies, the conflict shall be promptly reported to ICE, and the chief officer of the LEA, or designee, when circumstances safely allow the concern to be raised. ICE and the chief officer of the LEA shall attempt to resolve the conflict.

Whenever possible, the LEA will deconflict all addresses, telephone numbers, and known or suspected identities of violators of the INA with ICE's Homeland Security Investigations or ICE's Enforcement and Removal Operations prior to taking any enforcement action. This deconfliction will, at a minimum include wants/warrants, criminal history, and a person's address, and vehicle check through TECS II or any successor system.

LEA participating personnel authorized pursuant to this MOA may be assigned and/or co-located with ICE as task force officers to assist ICE with criminal investigations.

## XII.    REPORTING REQUIREMENTS

The LEA will be responsible for tracking and maintaining accurate data and statistical information for their 287(g) program, including any specific tracking data requested by ICE. Upon ICE's request, such data and information shall be provided to ICE for comparison and verification with ICE's own data and statistical information, as well as for ICE's statistical reporting requirements and to assess the progress and success of the LEA's 287(g) program.

## XIII.    RELEASE OF INFORMATION TO THIRD PARTIES

The LEA may, at its discretion, communicate the substance of this agreement to the media and other parties expressing an interest in the law enforcement activities to be engaged in under this MOA. It is the practice of ICE to provide a copy of this MOA, only after it has been signed, to requesting media outlets; the LEA is authorized to do the same.

The LEA hereby agrees to coordinate with ICE prior to releasing any information relating to, or exchanged under, this MOA. For releases of information to the media, the LEA must coordinate in advance of release with the ICE Office of Public Affairs, which will consult with ICE Privacy Office for approval prior to any release. The points of contact for ICE and the LEA for this purpose are identified in Appendix C. For releases of information to all other parties, the LEA must coordinate in advance of release with the FOD or the FOD's representative.

Information obtained or developed as a result of this MOA, including any documents created by the LEA that contain information developed or obtained as a result of this MOA, is under the control of ICE and shall not be disclosed unless: 1) permitted by applicable laws, regulations, or executive orders; and 2) the LEA has coordinated in advance of release with (a) the ICE Office of Public Affairs, which will consult the ICE Privacy Office for approval, prior to any release to the media, or (b) an ICE officer prior to releases to all other parties. LEA questions regarding the

applicability of this section to requests for release of information shall be directed to an ICE officer.

Nothing herein limits LEA's compliance with state public records laws regarding those records that are solely state records and not ICE records.

The points of contact for ICE and the LEA for the above purposes are identified in Appendix C.

## XIV.    LIABILITY AND RESPONSIBILITY

Except as otherwise noted in this MOA or allowed by federal law, and to the extent required by 8 U.S.C. § 1357(g)(7) and (8), the LEA will be responsible and bear the costs of participating LEA personnel regarding their property or personal expenses incurred by reason of death, injury, or incidents giving rise to liability.

Participating LEA personnel will be treated as Federal employees for purposes of the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1), 2671-2680, and worker's compensation claims, 5 U.S.C. § 8101 et seq., when performing a function on behalf of ICE as authorized by this MOA. *See* 8 U.S.C. § 1357(g)(7); 28 U.S.C. § 2671. In addition, it is the understanding of the parties to this MOA that participating LEA personnel performing a function on behalf of ICE authorized by this MOA will be considered acting under color of federal authority for purposes of determining liability and immunity from suit under federal or state law. *See* 8 U.S.C. § 1357(g)(8).

Participating LEA personnel named as personal-capacity defendants in litigation arising from activities carried out under this MOA may request representation by the U.S. Department of Justice. *See* 28 C.F.R. § 50.15. Absent exceptional circumstances, such requests must be made in writing. LEA personnel who wish to submit a request for representation shall notify the local ICE Office of the Principal Legal Advisor (OPLA) field location at  Detroit Field Office                          . OPLA, through its headquarters, will assist LEA personnel with the request for representation, including the appropriate forms and instructions. Unless OPLA concludes that representation clearly is unwarranted, it will forward the request for representation, any supporting documentation, and an advisory statement opining whether: 1) the requesting individual was acting within the scope of his/her authority under 8 U.S.C. § 1357(g) and this MOA; and, 2) such representation would be in the interest of the United States, to the Director of the Constitutional and Specialized Tort Litigation Section, Civil Division, Department of Justice (DOJ). Representation is granted at the discretion of DOJ; it is not an entitlement. *See* 28 C.F.R. § 50.15.

The LEA agrees to cooperate with any federal investigation related to this MOA to the full extent of its available powers, including providing access to appropriate databases, personnel, individuals in custody and documents. Failure to do so may result in the termination of this MOA. Failure of any participating LEA employee to cooperate in any federal investigation related to this MOA may result in revocation of such individual's authority provided under this MOA. The LEA agrees to cooperate with federal personnel conducting reviews to ensure compliance with the terms of this MOA and to provide access to appropriate databases, personnel, and documents necessary to complete such compliance review. It is understood that information provided by any LEA personnel under threat of disciplinary action in an administrative investigation cannot be

used against that individual in subsequent criminal proceedings, consistent with *Garrity v. New Jersey*, 385 U.S. 493 (1967), and its progeny.

As the activities of participating LEA personnel under this MOA derive from federal authority, the participating LEA personnel will comply with federal standards relating to the Supreme Court's decision in *Giglio v. United States*, 405 U.S. 150 (1972), and its progeny, which govern the disclosure of potential impeachment information about possible witnesses or affiants in a criminal case or investigation.

The LEA and ICE are each responsible for compliance with the Privacy Act of 1974, 5 U.S.C. § 552a, DHS Privacy Act regulations, 6 C.F.R. §§ 5.20-5.36, as applicable, and related system of records notices regarding data collection and use of information under this MOA.

## XV. COMPLAINT PROCEDURES

The complaint reporting and resolution procedure for allegations of misconduct by participating LEA personnel, regarding activities undertaken under the authority of this MOA, is included at Appendix B.

## XVI. CIVIL RIGHTS STANDARDS

Participating LEA personnel who perform certain federal immigration enforcement functions are bound by all applicable federal civil rights statutes and regulations.

Participating LEA personnel will provide an opportunity for subjects with limited English language proficiency to request an interpreter. Qualified foreign language interpreters will be provided by the LEA as needed.

## XVII. MODIFICATION OF THIS MOA

Modifications of this MOA must be proposed in writing and approved by the signatories.

## XVIII. EFFECTIVE DATE, SUSPENSION, AND TERMINATION OF THIS MOA

This MOA becomes effective upon signature of both parties and will remain in effect until either party terminates or suspends the MOA. Termination by the LEA shall be provided, in writing, to the local Field Office.

In instances where serious misconduct or violations of the terms of the MOA come to the attention of ICE, the ICE Director may, upon recommendation of the Executive Associate Director for Enforcement and Removal Operations, elect to immediately suspend the MOA pending investigation of the misconduct and/or violations.

Notice of the suspension will be provided to the LEA, and the notice will include, at a minimum, (1) an overview of the reason(s) that ICE is suspending the 287(g) agreement, (2) the length of the temporary suspension, and (3) how the LEA can provide ICE with information regarding the alleged

misconduct and/or violations, as well as any corrective measures it has undertaken.

ICE shall provide the LEA with a reasonable opportunity to respond to the alleged misconduct and/or violations and to take actions to implement corrective measures (e.g., replace the officer(s) who are the focus of the allegations). ICE will provide the LEA timely notice of a suspension being extended or vacated.

If the LEA is working to take corrective measures, ICE will generally not terminate an agreement. The termination of an agreement is generally reserved for instances involving problems that are unresolvable and detrimental to the 287(g) Program.

If ICE decides to move from suspension to termination, ICE will provide the LEA a 90-day notice in advance of the partnership being terminated. The notice will include, at a minimum: (1) An overview of the reason(s) that ICE seeks to terminate the 287(g) agreement; (2) All available data on the total number of aliens identified under the 287(g) agreement; and (3) Examples of egregious criminal aliens identified under the 287(g) agreement. ICE's decision to terminate a MOA will be published on ICE's website 90 days in advance of the MOA's termination.

This MOA does not, is not intended to, shall not be construed to, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any person in any matter, civil or criminal.

By signing this MOA, each party represents it is fully authorized to enter into this MOA, accepts the terms, responsibilities, obligations, and limitations of this MOA, and agrees to be bound thereto to the fullest extent allowed by law.

**For the LEA:**

Date: 4/23/2025

Signature:

Name: John Blair

Title: Chief of Police

Agency: City of Taylor Michigan Police Department

**For ICE:**

Date: 4.28.2025

Signature:

Name: Todd M. Lyons

Title: Acting Director

Agency: Department of Homeland Security

U.S. Immigration and Customs Enforcement

## APPENDIX A

### POINTS OF CONTACT

The ICE and LEA points of contact for purposes of implementation of this MOA are:

For ICE:        Department of Homeland Security
Immigration and Customs Enforcement
Enforcement and Removal Operations
Assistant Director for Enforcement
Washington DC

For the LEA:     **John Blair**

Chief of Police

734-287-6611

23515 Goddard rd. Taylor Mi 48180

jblair@ci.taylor.mi.us

## APPENDIX B

## COMPLAINT PROCEDURE

This MOA is an agreement between ICE and the <u>City of Taylor Michigan Police Department</u>, hereinafter referred to as the "Law Enforcement Agency" (LEA), in which selected LEA personnel are authorized to perform immigration enforcement duties in specific situations under federal authority. As such, the training, supervision, and performance of participating LEA personnel pursuant to the MOA, as well as the protections for individuals' civil and constitutional rights, are to be monitored. Part of that monitoring will be accomplished through these complaint reporting and resolution procedures, which the parties to the MOA have agreed to follow.

If any participating LEA personnel are the subject of a complaint or allegation involving the violation of the terms of this MOA the LEA shall, to the extent allowed by state law, make timely notification to ICE.

Further, if the LEA is aware of a complaint or allegation of any sort that may result in that individual receiving professional discipline or becoming the subject of a criminal investigation or civil lawsuit, the LEA shall remove the designated LEA personnel from the program, until such time that the LEA has adjudicated the allegation.

The LEA will handle complaints filed against LEA personnel who are not designated and certified pursuant to this MOA but are acting in immigration functions in violation of this MOA. Any such complaints regarding non-designated LEA personnel acting in immigration functions must be forwarded to the ICE Office of Professional Responsibility (OPR) at ICEOPRIntake@ice.dhs.gov.

### 1. Complaint Reporting Procedures

Complaint reporting procedures shall be disseminated as appropriate by the LEA within facilities under its jurisdiction (in English and other languages as appropriate) in order to ensure that individuals are aware of the availability of such procedures. Complaints will be accepted from any source (e.g., ICE, LEA, participating LEA personnel, inmates, and the public).

Complaints may be reported to federal authorities as follows:

A.      Telephonically to the ICE OPR at the toll-free number 1-833-4ICE-OPR; or

B.      Via email at ICEOPRIntake@ice.dhs.gov.

Complaints may also be referred to and accepted by any of the following LEA entities:

A.      The LEA Internal Affairs Division; or
B.      The supervisor of any participating LEA personnel.

**2. Review of Complaints**

All complaints (written or oral) reported to the LEA directly, which involve activities connected to immigration enforcement activities authorized under this MOA, will be reported to the ICE OPR. The ICE OPR will verify participating personnel status under the MOA with the assistance of ICE. Complaints received by any ICE entity will be reported directly to the ICE OPR as per existing ICE policies and procedures.

In all instances, the ICE OPR, as appropriate, will make an initial determination regarding DHS investigative jurisdiction and refer the complaint to the appropriate office for action as soon as possible, given the nature of the complaint.

Complaints reported directly to the ICE OPR will be shared with the LEA's Internal Affairs Division when the complaint involves LEA personnel. Both offices will then coordinate appropriate investigative jurisdiction, which may include initiation of a joint investigation to resolve the issue(s).

**3. Complaint Resolution Procedures**

Upon receipt of any complaint the ICE OPR will undertake a complete review of each complaint in accordance with existing ICE allegation criteria and reporting requirements. As stated above the ICE OPR will adhere to existing ICE reporting requirements as they relate to the DHS OIG and/or another legally required entity. Complaints will be resolved using the existing procedures, supplemented as follows:

  A. Referral of Complaints to LEA Internal Affairs Division.

  The ICE OPR will refer complaints, as appropriate, involving LEA personnel to the LEA's Internal Affairs Division for resolution. The Internal Affairs Division Commander will inform ICE OPR of the disposition and resolution of any complaints referred by ICE OPR.

  B. Interim Action Pending Complaint Resolution

  Whenever any participating LEA personnel are under investigation and subject to interrogation by the LEA for any reason that could lead to disciplinary action, demotion, or dismissal, the policy requirements of the LEA shall be honored. If appropriate, an individual may be removed from participation in the activities covered under the MOA pending resolution of an inquiry.

  C. Time Parameters for Resolution of Complaints

  It is expected that any complaint received will be resolved within 90 days. However, this will depend upon the nature and complexity of the substance of the complaint itself.

  D. Notification of Resolution of a Complaint

ICE OPR will coordinate with the LEA's Internal Affairs Division to ensure notification as appropriate to the subject(s) of a complaint regarding the resolution of the complaint.

## APPENDIX C

## PUBLIC INFORMATION POINTS OF CONTACT

Pursuant to Section XIII of this MOA, the signatories agree to coordinate any release of information to the media regarding actions taken under this MOA. The points of contact for coordinating such activities are:

**For the LEA:**

John Blair

Chief of Police

734 552 7813

23515 Goddard rd  Taylor mi 48180

jblair@ci.taylor.mi.us

**For ICE:**

Department of Homeland Security
Immigration and Customs Enforcement
Office of Public Affairs

**Exhibit F**

Michigan Department of Treasury numbered letter "1999-5 Drug Forfeiture Funds" (August 6, 1999), which heavily cites Michigan AG Opinion No. 6561 (1989) (Exhibit G), providing guidance on federal-local law enforcement task-force agreements:

*"11. I am a member of a county (or township) board or a city (or village) council and the board (or council) has not entered into an agreement with other police agencies for drug enforcement purposes. May a police chief or sheriff enter such an agreement without the board's (or council's) approval?*

*No. The Urban Cooperation Act requires the agreement to be approved by the governing bodies of the participating units."*

- For Michigan Department of Treasury numbered letter "1999-5 Drug Forfeiture Funds" (August 6, 1999) see:

https://www.michigan.gov/treasury/local/lafd/letters/1999/1999-5-drug-forfeiture-funds

**Exhibit G**

Michigan Attorney General Opinion No. 6561 (1989), providing guidance on federal-local law enforcement task-force agreements:

- *"A law enforcement task force may be created by the legislative bodies of governmental units and, alternatively, law enforcement agencies may function as a joint enterprise."*

- *"A law enforcement task force…may be formed pursuant to various statutes, including the intergovernmental contracts between municipalities act and the Urban Cooperation Act of 1967."*

- *"a municipality must appropriate any moneys or goods of a municipality under statutory authority or under contract which is statutorily authorized in order to permit subsequent expenditure. The Uniform Budgeting and Accounting Act, MCL 141.439(1); MSA 5.3228(39), imposes this requirement on units of local government:*

- *'A member of the legislative body, the chief administrative officer, fiscal officer, an administrative officer, or an employee of a local unit shall not authorize or participate in the expenditure of funds except as authorized by a general appropriations act. An expenditure shall not be incurred except in pursuance of the authority and appropriations of the legislative body of the local unit.'"*

- *"no expenditure of funds should be made by a task force without appropriation therefor by the local units from which the participants of the task force originate."*

- For Michigan AG Opinion No. 6561 (1989) in full see:

https://www.ag.state.mi.us/opinion/datafiles/1980s/op06561.htm#:~:text=Opinion%20%236561&text=A%20law%20enforcement%20task%20force,function%20as%20a%20joint%20enterprise.

Exhibit H – Federal Recognition of Taylor as a Participating Agency

Primary source verifying that Taylor, Michigan is actively participating in the Task Force Model as recognized by ICE, listed on line 592 at the time this Exhibit was made.

Dated:   1/5/2026

https://www.ice.gov/identify-and-arrest/287g.

Navigate to "View 287(g) participating agencies"

